(37 South 30.)

No. 14,946.

STATE v. GIANFALA.

(Feb. 15, 1904.)

HOMICIDE—EVIDENCE—CONFESSIONS — DURESS —RES GESTÆ—INSTRUCTIONS—IMPEACHING VERDICT.

1. The confessions of defendant, admitted in evidence, were not extorted by threats of violence or the infliction of punishment.

2. The witnesses who testified as to these confessions stated substantially all that the prisoner said bearing upon the difficulty.

3. Statements of defendant after the difficulty were not part of the res gestæ, but it was the confession of the fact germane to the difficulty.

4. The imprecations of the infuriated wife and her attempt at inflicting physical pain were not the placing of defendant in fear, to the exclusion of his answer to her as a confession made at the beginning of her unjustifiable assault.

5. The deceased always declared after he had been shot that he believed himself to be beyond the probability of recovery. There does not appear to have been any hope on his part of living.

6. He (deceased) followed the advice of his physician without manifestation on his part that he expected to recover from his injuries.

"Very often a desire to be freed from the intense pain will prompt the sending for medical aid, although all hope of life has been abandoned." State v. Evans, 28 S. W. 8, 124 Mo. 397; McQueen v. State, 15 South. 824, 103 Ala. 12; Walton v. State, 5 S. E. 203, 79 Ga. 446.

7. The defendant, having been found guilty of manslaughter, has no ground to complain of the trial judge's charge relating to a deadly weapon, and uses of such a weapon in a difficulty. If the charge be error, it was not prejudicial error, in view of the verdict returned.

8. A juror is not permitted to testify that another member of the jury evinced malice and hatred against the accused.

On Rehearing.

9. In order that statements should be res gestæ, the speaker must have been prompted to speak solely from the excitement of the event of which it is claimed the statement formed a part, and before he could have sufficiently regained his self-possession to be suspected of having made the statement from design.

10. Statements of the prisoner will not be admitted as confessions unless the court is satisfied the making of them was not induced by fear or hope.

11. Though the wounded man said he thought he was going to die, yet, if he asked the opinion of a physician, and, on his advice, started on a journey to a distant city to have himself operated on, as being his one chance of recovery, his statements will not be admitted as dying declarations; it not appearing that he was not without some slight hope of recovery.

Breaux, C. J., dissenting.

(Syllabus by the Court.)

Appeal from Twenty-Third Judicial District Court, Parish of St. Mary; Albert Campbell Allen, Judge.

Francesco Gianfala was convicted of manslaughter, and appeals. Reversed.

Foster, Milling, Godchaux & Sanders, for appellant. Walter Guion, Atty. Gen., and W. K. Wilson, Dist. Atty. (D. Caffery & Son, Henry Mayer, and Lewis Guion, of counsel), for the State.

BREAUX, J. The defendant, Francesco Gianfala, was indicted by the grand jury of the parish of St. Mary the 25th day of June, 1902, for the alleged murder of Joseph Rosheger, in that parish, on the 20th day of June, 1902.

The case was regularly assigned. The trial resulted in a verdict of manslaughter.

The court, on this verdict, condemned the defendant to serve 11 years in the penitentiary.

Defendant, through counsel, reserved a number of bills of exception which present various points for decision on appeal.

The record discloses that there was bad blood between defendant and the wife of the deceased. She, as defendant thought, had calumniated his wife. On the morning of the day of the difficulty, the wife of the deceased used insulting words in hearing of defendant. About 11 o'clock the same day, defendant and the deceased met, and fell to fighting. At the opening of the fight a fatal shot was fired, it is said, by the defendant, and a mortal wound was inflicted on deceased. In fighting, they fell on the ground, and, while scuffling, deceased said to a bystander, who had just rushed to the place where the fighting was going on, that he was mortally wounded. The one to whom this was said by deceased kicked the pistol out of the hand of the defendant, and then he and another man separated the two combatants.

The deceased was taken by him (this witness) and others of the crowd to his home, near by, and laid in his bed. Soon after, the deceased repeated that he was mortally wounded, and said that defendant had shot him for nothing. Deceased had at no time given the least expression that he had any hope of surviving, from the time that he received the fatal shot to the time that the physician came to his bedside. When the physician came, the deceased said to him that he thought he would die. To use the language of the doctor most favorable to the accused on this point:

"He told me that he did not feel like he would ever get well, and that he had little hope, and repeated that over several times."

And again:

"He repeated about the same thing—that he thought that he was mortally hurt. I do not remember his exact words."

The physician, in course of the conversation at the bedside, said to deceased that he would have to be put in the hands of a surgeon in New Orleans, and a surgical operation was his only hope to recover. He, under the physician's advice, accompanied by him (the physician), left for New Orleans to be operated upon, and it follows that he took whatever chance there was of his getting well again. He left Patterson for New Orleans about two hours after the shooting. In about two days after his arrival at the Charity Hospital he died. His brother testified that he (the deceased) said before and after the physician had left him that he could not live.

The wife of the deceased came up to the defendant about three minutes after the shooting, while some one was holding the defendant, near the place where the fighting occurred, and, while she was in the act of catching hold of him and shaking him with her hands, remarked, "You killed my husband," to which defendant replied that the wife of the deceased had used, regarding his own wife, language of such a character as we will not here write down. Defendant was taken charge of as a prisoner by the deputy sheriff, who tied him, and ordered him to a seat in his buggy, to which he fastened the ends of the ropes with which defendant was tied.

On the way to the parish seat, a distance of about 15 miles from the place where the difficulty occurred, once, at least, defendant complained of the rope that held him around his wrists, and said it was too tightly tied, and offered $50 to have this rope loosened.

He afterwards asked the deputy to release him, and said he would pay him $150. On the refusal of the deputy, his words were, in substance, that he (the deputy) would be the next.

At a distance of about two miles from Franklin, the sheriff rode down and took charge of the prisoner. The deputy then returned to Patterson. After some little time the defendant asked the sheriff to loosen the

rope around his wrist. This the sheriff declined to do; saying to him that they had only a short distance to go, and that he would be untied at the jail. When he was untied the imprint of the rope was upon his arms, and his arms were red and swollen. In a few days the swelling disappeared entirely.

The foregoing are the salient facts.

First. The grounds of the defense are that the confessions were not admissible, as they have not been voluntarily made.

Second. That the testimony admitted as part of the res gestæ was not part of the res gestæ.

Third. That no sufficient basis was laid to admit dying declarations.

These are the main grounds. Other points are presented as incidental to and connected with the issues, which we will take up in due order in deciding them.

The objections to the evidence of confessions are before us, as set forth in several bills of exceptions.

It may be proper to remark in this place that the confession was not a full confession. It was made only as to one fact of shooting the deceased. In other words, the defendant did not admit his guilt. He only confessed that he fired the fatal shot. It still remained for the court and jury to examine all other facts to find out whether the accused was guilty. It is unimportant, as relates to the point to be decided, whether the confession was full or partial.

At the outset we desire to state that we have no dissent to express from the text of decisions quoted by the defense. Unquestionably the voluntary declaration of a person charged with crime should only be received after the court has exercised due vigilance and watchfulness in the matter of laying the foundation for its admissibility. It must be shown that it was voluntarily made. It loses all value as evidence when it appears that the confession was made under the influence of threats, hope, or fear.

From this point of view, we have not found that the voluntary statement of defendant was inadmissible, and the following are our reasons:

The prosecuting attorneys called a witness (Hausmann), and proved by him that he had not threatened the deceased at the time that he made a voluntary statement to him (the witness), and that the declaration was voluntary and without promise of anything.

The complaint of the defense on this point is that the prosecuting attorneys did not attempt to prove that no one else had assaulted the defendant or that no one else intimidated him at the time his confession was made; that, if this witness and another (Gooch) who testified upon the subject had been properly examined by the state as witnesses for the state, the defense would have been placed on its guard against facts which were developed after their testimony had been received.

The facts were that the wife of the deceased, Mrs. Rosheger, attacked and fought the defendant, as before mentioned, while he (defendant) was held by one Hausmann. Although these facts were not brought out by the state in examining in chief, there was no irregularity committed by the prosecution, for the witnesses were asked the usual question to lay the foundation to admit their testimony.

The defense had the right to question these witnesses regarding all the circumstances in reference to the time, place, and all relating to the alleged confession, and to bring such other facts as it deemed proper in order to attack the foundation as laid. State v. Miller, 42 La. Ann. 1186, 8 South. 309, 21 Am. St. Rep. 418.

This was not done at first. Afterward it developed that this woman, Rosheger, had attacked defendant.

Even if illegal testimony had been admitted after the court's ruling had been made that sufficient foundation had been laid, the

defense was not at the mercy of illegal testimony, if it had come to light, after the testimony had been admitted, that it was entirely illegal because of the intimidation of the defendant—a fact unknown to the court when the ruling was made. Of course, it would then have devolved upon the trial judge to reverse his ruling, and to have had the illegal testimony erased.

Our study of the points of this cause has not resulted in convincing us that there was such intimidation practiced on the part of this wife as rendered the testimony inadmissible. Although her conduct was improper in the extreme—to a degree that we will not stop to characterize—did it amount to intimidation? The answer of the defendant to her question does not show that he was intimidated. The witness Hausmann was not holding him to afford this woman the opportunity to assault the defendant. She was an angry woman—frantic, wild—whose irrational acts were not even repulsed by the defendant, as we understand.

As we appreciate the facts, the question and answer objected to had all been prior to the violent assault of which this woman was guilty—at any rate, at the beginning of the assault, which it does not seem to us was sufficient to intimidate a man who was determined enough to meet another and engage in the fight which he did, and to continue the struggling as was done. The district judge states officially that self-defense was set up by defendant. The doctrine of self-defense was dwelt upon at large in the charge, and the record shows that this was one of the issues. The error, in view of this issue, is, to say the least, not manifest. The following is the statement in the bill of exception: "The wife of the man he shot rushed up to him and said, 'You killed my husband.' He replied, 'You called my wife a ———.'" She then commenced to fight. The confession was admissible.

The defendant again made admissions on his way from the place of the difficulty to the jail, by offering an amount to the deputy sheriff to turn him loose. Such offers afford ground of presumption against an accused, and are admissible in evidence.

The question arises, why should an offer have been made, such as was made, if the defendant was innocent? This is the rule of law which usually obtains in such cases. The fact that he was tied at the time has no significance in itself. He may have been tied too tight by the deputy—an act possibly deserving censure—and yet that would not justify him to use the words he did.

It gave rise to an admissible inference of a desire to evade justice. Wharton, Criminal Ev. § 750.

In the first bill of exception, as well as in other bills here and there, defendant raises the objection that the witnesses who swore to a confession did not sufficiently particularize; that they did not remember with sufficient precision what was said by the defendant. This is also referred to and argued with great earnestness in defendant's brief. We do not think, in order that evidence of the confession may be admissible, that it is necessary for the witness to repeat the conversation with severe exactness. It is sufficient if the witness repeats, in the main, all that was said, and if it be evident to the trial judge that no prejudice is done by a slip of the memory here and there in regard to what was said.

· "It is enough, to be admissible, that the substance of the confession was given." State v. Desroches, 48 La. Ann. 428, 19 South. 250.

This brings us to the dying declaration, and to a consideration whether or not it was admissible.

The statement of the accused, while the fight was going on, that he was mortally shot, was, in our view, part of the res gestæ. The parties were on the ground, scuffling. The fatal shot had been fired at the beginning of the fight and scuffle. A statement

made then by the wounded man was part of the res gestæ. It was immediately connected with and incidental to the difficulty.

"Though a fact be passed, if it continues to exert a direct influence on the mind of the speaker—if the statement can be fairly taken to be not so much the narrative result of thought as the natural and inevitable outcome of the circumstances under which it is uttered—it is, in general, admissible." Best on Evidence, p. 469.

In this instance it was not after the fight, as the fight was still on when the declaration was made by the deceased. If not admissible as part of the res gestæ, it was certainly admissible as a dying declaration, for the wounded man at the same time, and in the same sentence, said, in substance, that he was a dying man.

In another bill of exception further objection is raised to the testimony of two witnesses (Gooch and Hausmann) who were present toward the end of the difficulty, and who took part in arresting the defendant. The judge says in regard to the testimony of these two witnesses that the statement heard by the witness Gooch was the same statement heard by the witness Hausmann, except that they did not agree as to the time which elapsed between the shooting and the time at which the defendant made the statement of having shot the deceased. One (Gooch) says it was between five and ten minutes, while Hausmann says it was only three minutes. Gooch swears that after he had, with others, separated the parties, they took the deceased into his house and put him on or in the bed, and he (Gooch) returned to the sidewalk and saw the defendant about to move off. Hausmann caught hold of him. It was then that defendant made the statement before mentioned in answer to Mrs. Rosheger, as before mentioned. The court a qua ruled that on this showing the answer was admissible, both as voluntary declaration and as part of the res gestæ. We are of the opinion that, if this declaration was not part of the res gestæ, it was a voluntary dec-

laration. We consider it to have been a voluntary declaration of the accused, for reasons before stated, that he was not intimidated by Mrs. Rosheger when he made the declaration.

This brings us to the subject of the dying declaration, which presents a serious question for decision.

The objection of the defendant to the admissibility of the dying declaration was, substantially, that the deceased was not under the sense of impending dissolution at the time; that the declaration, as stated by the witness, was not sufficiently full to be admitted as evidence. And again, that the deceased had made a dying declaration before the justice of the peace, which was the proper declaration in case the testimony is admissible at all.

The judge says, as relates to this dying declaration, that the deceased made two statements to the witness Gooch—one, when the deceased was prone on the banquette, struggling with the defendant; the second, after the deceased had been taken to his home and was lying on his bed, where he declared:

"Mr. Gooch, I am shot. Frank shot me, and I am going to die. I am shot where the president was" (referring to President McKinley).

The judge says a statement made under such circumstances, "when the person wounded is under the express belief that he is about to face his Maker, is unquestionably admissible as a dying declaration."

We have the positive statement of the accused, repeated at short intervals of time, that he expected to die. Declarations made under solemn sense of impending dissolution, as we infer was made in this instance, we infer, are admissible.

But the contention of the defense further is that the deceased had made a written dying declaration and that it alone, if any was admissible, was admissible. The dying declaration reduced to writing by the justice of the

peace, and which was admitted in evidence, was made some time afterward; i. e., a few hours after the visit of the physician who attended the deceased.

He made several of these declarations. The one to the witness Gooch was made at a time anterior to that made to the justice of the peace. They were admissible. The form of the declaration is immaterial.

We do not consider the written document in the nature of primary evidence which had the effect of excluding all other evidence upon the subject. It did not have the effect of excluding all verbal evidence. Wharton's Criminal Evidence, p. 295.

We think it was sufficiently shown that the deceased thought that he was in a dying condition.

There is, so to speak, a dent in the testimony—a very serious objection as relates to the dying declaration, which arrests attention and causes a moment's hesitation. The physician called upon the patient a short time after he had been wounded. The deceased had, as we have already stated, made the declarations which the trial court held were dying declarations.

We infer that the physician gave very little encouragement to his patient, and that the patient was not made hopeful of life by the presence and utterances of his physician.

It is true that the physician suggested to him that a surgical operation was necessary, and that he must repair to the city, to which the deceased consented. It does not follow, because a physician makes suggestions, that necessarily to the patient was given hope that he would live. Nor does it appear that deceased, despite his declaration that he would die, thought during or after the physician's visit that he could live. There are many who take the physician's advice from intuition; others, as a matter of principle, not wishing to surrender life unless all the remedies which the physician's skill offers have been tried. During the whole time the

patient may still be quite convinced that for him there is no hope. The deceased in this case at all times said, in substance, that there was no hope.

We would not be fully justified in arriving at the conclusion that he must have had some hope, despite his repeated declaration to the contrary.

We are brought to the consideration of another bill of exception, which we will pass with the statement that, in our view, although the witness may not have stated the whole dying declaration when he was examined by the court apart from the jury to see whether it was admissible, he (the witness) may add words uttered by the deceased when he afterwards testified before the jury, although he (this witness) may not have made the statement of the additional declaration to the court. This witness had said to the trial judge, when he was examined separate and apart from the jury; that the deceased declared to him that he was shot by the defendant, but he did not add that which he afterwards said to the jury, "Frank [meaning the defendant] shot me for nothing." This testimony was admissible, and would have been properly admitted whether stated to the judge or not. The witness was under oath to state the whole declaration, which he did. We do not think that there was ground to exclude the testimony. The objection made went to the effect to be given to the testimony, and not to its admissibility.

We will pass the next bill of exception with the comment that it relates to threats by the accused made shortly before the homicide. It was admissible.

The authorities are that such testimony is admissible for the purpose stated. They are admitted because from them guilt may be inferred. Wharton's Criminal Evidence, § 756.

Regarding another bill of exception, we think it is disposed of by the statement that there was no necessity to be an expert in

order to testify to the jury that the deceased, a few hours before his death, pointed to the locus of his suffering and made some unimportant statement. The evidence had no bearing. It could not in the least prejudice the accused, and therefore we pass to the next bill of exception.

Mr. Penny, one of the witnesses, was asked to detail a statement made by Rosheger, the deceased, during the time that he (the deceased) was struggling with the accused. The statement as made was objected to by counsel for the defense on the ground that the witness did not remember all that was said, and as "a witness could not remember he should not be permitted to testify."

This objection was overruled by the court. Repeated decisions hold that the substance of the confession is admissible. Union Wood Preserving Co. v. Bell, 29 La. Ann. 14.

Wharton's Criminal Evidence, § 688: Nor is it required to swear to the very words.

And again: A confession is not to be excluded because the witness does not remember all the confession. State v. True, 88 N. C. 630.

Upon these grounds, we have not found that defendant had good cause to complain.

With reference to the testimony of the brother of the deceased to which objection is urged, we think that those objections are disposed of by our rulings on questions already considered. We will add further that the brother testified that the deceased was conscious of the impending death at the time the statement was made to him as to who shot him, which was admitted and went before the jury. We think it sufficient foundation laid for the admissibility of this testimony. It was a mere repetition of what had been said to other witnesses in the case, and all going to show that the deceased was under the sense of impending dissolution, according to his statement, and, he was so near death, two days afterwards he breathed for the last time.

With reference to the dying declaration made before the justice of the peace, we think it was not amenable to the objection directed against it by the defendant. This officer exercised some discretion, and wrote down only such statement as had any bearing upon the statement that deceased had been shot by the accused.

It is stated positively in this declaration that he (the deceased) said that he expected to die, and every material fact was written down.

The defense requested the trial judge to specially charge the jury as follows:

"I charge you that the fact that a man's being armed with a deadly weapon, though he may be the aggressor in a difficulty, amounts to nothing, unless he provides himself with a weapon with a view of using it, if necessary, in overcoming his adversary. The fact as to whether or not he did so provide himself with the weapon is a fact for the jury, and the burden of establishing that fact is upon the state."

The trial judge refused to deliver this charge as written. It was amended, and, as amended, read to the jury. It read as follows:

"I charge you that the fact of a man being armed with a deadly weapon, though he may be the aggressor in a difficulty, amounts to nothing, unless he provides himself with a weapon with a view of using it, if necessary, in overcoming his adversary, and does not use it by first making the attack himself. The fact as to whether or not he did so provide himself with a weapon is a fact for the jury, and the burden of establishing that fact is upon the state."

With reference to the burden of proof, there was no special difference between the defense and the state. With reference to carrying the deadly weapon, and the inference to be drawn therefrom under certain circumstances, we have not found that the amendment was error. The defendant, it must be borne in mind, was charged with murder, and found guilty of manslaughter.

In view of the verdict, we do not infer that there was error in the instruction of the court.

We infer that the facts of the case, as a

matter of law, justified the trial judge in adding the words, "provided he does not use the weapon by first making the attack himself," and from that point of view, we are constrained to decline interfering with the verdict.

In one of the bills of exception of the defense sought to have it charged by the trial judge that (we follow the special charge requested) it must be borne in mind by the jury that the accused has not the power of cross-examination—a power essential to the eliciting of all the truth as the obligation of an oath—and therefore the accused is entitled to every allowance and benefit that he may have lost by the absence of the opportunity of more full investigation by means of cross-examination.

The trial judge states that he refused to thus charge because he had charged the jury fully on that point in his general charge.

We return to the general charge, and find that, while not as full as the special charge requested, yet the jury's attention was, in the main, directed to the fact that the accused did not have the opportunity of cross-examination, and to other facts referred to in the requested charge.

With reference to the verdict and objection thereto, it appears that the verdict returned was not legally formed, and it remained with the court to direct the jury to return to their room of deliberation, and to return a verdict in legal form. In making their first return, which was not in legal form, as just stated, they recommended the defendant to the mercy of the court. In the second, they did not choose to add this recommendation. They were not instructed by the court regarding recommendation to mercy.

Instruction had been given by the judge in the first charge, and there was really no necessity for repetition when the jury were ordered to return to their deliberation room. The court was made aware that the jury de-

sired to recommend the defendant to mercy, and this was sufficient. Under the circumstances, the verdict is not vitiated by not having inserted the recommendation to mercy as part of the verdict.

On the application for a new trial, complaint is directed against one of the jurors as having entertained and shown feeling unfriendly to the accused. It was attempted to show this alleged feeling of the juror by another juror. It is well settled that jurors cannot impeach their testimony upon grounds such as here alleged. The evidence of this juror was properly excluded.

While the defendant was vigorously prosecuted, on the other hand the defense was equally as alert in availing itself of every possible ground of defense. We find no ground upon which to extend relief to this unfortunate defendant. The jury has found him guilty. The solemn duty remains for us to affirm the verdict.

The sentence and verdict appealed from are affirmed.

## On Rehearing.

### (June 30, 1904.)

PROVOSTY, J. After a rehearing had been granted in this case, the court, through the Chief Justice, handed down for the guidance of counsel the following:

"The court indicates the lines along which specially it would be pleased to hear argument in this case:

"First. Whether or not the asserted remarks of one of the jurors, said to have been overheard by the deputy sheriff, were prejudicial to the accused, to the extent rendering it legal to set aside the verdict, and all questions relating to the asserted remark.

"Second. Whether or not the confession made by the accused while held by some one, and while the wife of the deceased was acting as the testimony discloses she was, should have been excluded as not being voluntary.

"Third. Whether or not the deceased had hope of recovery when he made his dying declarations, and whether the dying declarations should be excluded.

"Fourth. Whether the testimony of Mrs. Rosheger, wife of the deceased, should have been excluded, and whether the grounds set

forth in the bill of exception No. 14 were suffi-
cient to exclude her testimony."

The case has been reargued along these
lines, and additional briefs have been submit-
ted.

On the first of these grounds the attention
of the court has been called to the fact that
it is not stated or attempted to be proved by
the defendant that the knowledge of the
misconduct or disqualification of the juror
did not come to him before verdict. So far
as the court is informed, the defendant may
have known of this irregularity before ver-
dict. If so, it was not ground for new trial.
And the burden was on the defendant both
"to aver and show affirmatively that both he
and his counsel were ignorant of the mis-
conduct charged until after the trial." 12
Ency. P. & P. 558; 17 A. & E. Ency. of L.
1206; State v. Dorsey, 40 La. Ann. 739–743,
5 South. 26; Prof. Jury Trial, § 194.

We pass to the second ground, namely:

"Whether or not the confession made by the
accused while held by some one, and while the
wife of the deceased was acting as the testimony
discloses she was, should have been excluded, as
not being voluntary."

The facts are these: The fatal encounter
took place in front of the shop of Rosheger,
the deceased, on the banquette. The two
men scuffled and fought, and fell together,
and continued fighting on the ground, and
the fatal shot was fired during the scuffle.
The first person to reach the combatants
was the wife of the deceased and one August
Palumbo, both of whom came out of the shop.
The next person to reach the scene was T.
B. Gooch. The scuffling was still going on;
the combatants being down on the banquette,
fighting and struggling. A number of per-
sons came up. Gooch kicked the pistol out
of the hand of Gianfala, and he and the
witness Penny separated the two men. Pen-
ny and Gooch assisted Rosheger into his
shop, and then into his sleeping room, back
of the shop, and laid him on his bed. They
then returned to the gallery. By that time

quite a crowd—"a big crowd"—had gathered;
and one Hausmann, who had grabbed Gian-
fala, was holding him. At that moment Mrs.
Rosheger, the wife of the deceased, who had
gone to the telephone office and returned,
jumped upon Gianfala, in an access of fury,
"and clawed him and bit him and tore his
clothes"; and it was while this was going on
that the statement sought to be introduced
as a confession was made, namely, Mrs.
Rosheger said to Gianfala, "You killed my
husband;" and he answered, "You called my
wife a s—— of a b——.''

This statement of the accused was admit-
ted by the judge a quo on the double ground
that it was res gestæ and a confession. It
was admissible on neither ground.

It was not admissible as res gestæ, because
Gianfala had had time to regain his com-
posure sufficiently to get up a story to excuse
or palliate his act. His victim had been
taken inside the house, and he had been left
outside on the banquette with the crowd that
had gathered, and sufficient time had elapsed
for Penny and Gooch to have assisted the
wounded man onto the gallery and across the
shop and into his sleeping room, and laid
him upon his bed, and to have retraced their
steps to the gallery. How long this had
taken, is not known, as no one kept the time,
but Mrs. Rosheger had had time to go to the
telephone office and return. Gianfala had
had time to collect himself sufficiently to no-
tice some cartridges of his on the ground,
and to try to pick them up. This action pre-
supposes some degree of deliberation, and is
of itself sufficient to show that in what he
did or said thereafter he was not necessarily
the mere passive instrument or mouthpiece
through which acted or spoke the excitement
of the scene he had just been through, but
may well have been at himself, and bethink-
ing him of what was best to be done or said
in the predicament in which he found him-
self. The probability of the statement hav-
ing been a concoction is increased by the fact

that Mrs. Rosheger denies its truth—asserts positively that she never made use of the vile expression thus attributed to her.

Moreover, the statement was provoked by the accusation of the wife, "You killed my husband." It was made in response to that accusation, and by way of justification against it. When it was made a new combat had begun, which necessarily had had the effect of drawing the thoughts of Gianfala away from the past transaction and concentrating them upon the immediate crisis. He was being furiously belabored by the woman. Whether the description given of her by the counsel for the state (a frail woman) or that by counsel for the defense (a virago) fit her best is immaterial, since, however frail she was, her assault was enough to attract and absorb for the time being the attention of the subject of it. The mere arrest of a man has a sobering effect upon him—casts a damper upon his excitement. Now, if, in addition, while he is in custody, an infuriated woman fall upon him tooth and nail, it is hardly to be supposed that he will remain so unmindful of the actualities of the present as to continue to be the mere passive instrument or mouthpiece of the excitement of the past event. And in order that anything said after an event should be considered part of it, within the meaning of the law of res gestæ, the speaker must be supposed to have been prompted to speak solely by the excitement of the event. In other words, it must have been the event speaking through him. State v. Charles, 36 South. 29, 111 La. 933; 1 Greenleaf, Ev. § 110; Whart. Cr. Ev. 262.

To illustrate: Suppose that, instead of the statement in question, Gianfala had said: "I shot your husband because I saw him make a movement to draw a weapon upon me, and I thought he was going to shoot me. I only shot in order to be ahead of him." And suppose that, instead of the state, it was Gianfala who was contending that words uttered under the circumstances in question

were res gestæ. Would it not be answered to him at once that the story was a concoction? Assuredly it would. And yet, while defending himself as best he could from the attack of this infuriated woman, he might well have made just such a statement.

Nor was this statement admissible as a confession. It was made while Gianfala was being furiously assaulted as he was being held, and this in the presence of a more or less excited crowd. He a foreigner in their midst, probably understanding their language but imperfectly. Under these circumstances, he may well have been in fear, and may well have hoped to mitigate his act, and allay whatever animosity there might be against him in the crowd by bringing in his wife, and claiming that in what he had done he had acted in defense of her good name. Here is fully made out, we think, one of the main grounds of rejecting confessions—the danger of their not being true, and of their having been induced by hope or fear. 1 Greenleaf, § 214. "The admission of a confession," says Mr. Rice, in his work on Crim. Ev. vol. 3, § 311, quoting the Supreme Court of Tennessee, "is made to depend upon its being free of the suspicion that it was obtained by any threats or severity or promise of favor, or of any influence, even the minutest."

Here, we think, there was a strong influence operating upon this accused, situated as he was, to say something, whether true or false, to excuse or palliate his act. We know as a fact, from the testimony of Mrs. Rosheger, that this story was a fabrication; and we cannot escape the very strong suspicion that the Italian, as he was being thus held and assaulted in the presence of an unsympathetic crowd, was prompted to make this so-called confession by the exigency of his situation.

The next matter to be considered is that of the dying declarations. We think these declarations were not made under the sense

of impending dissolution, and were therefore inadmissible. True, the wounded man said, and kept repeating, that he was going to die, but his actions belied his words. When the physician arrived, which was a few minutes after the infliction of the wound, the wounded man caught his hand, and told him he was going to die, and asked him what he thought about it. This shows he had not given up all hope. Had he given up all hope, the physician would not have been to him any more than an ordinary person. He had not grasped in this manner the hand of any person that had approached him, but the physician represented to him the hope of life, and he grasped his hand, and asked him eagerly what he thought of the case. This indicates, we think, that he still had some hope. And the physician did not tell him there was absolutely no hope, but, on the contrary, that there would be a chance for him if he went to New Orleans and had himself operated on. And he decided at once to take that chance, though it necessitated his leaving wife and children behind and going to the Charity Hospital of a distant city. This shows that he was not entirely without hope. His hope may not have been very strong, but he had some hope; otherwise he would have remained quietly at his home, and thought of nothing but of preparation for his end. After the physician had told him of this chance of recovery, he no longer spoke to him of dying, but only said that he thought he was mortally hurt, and that he did not think he would ever get well; that he had little hope. To others he said he thought he would die, and notably to the justice of the peace who came to take his dying declaration. But this did not prevent his expediting his preparations to set out on his journey to the Charity Hospital of the city of New Orleans to take advantage of his one chance of recovery.

In the case of State v. Molisse, 36 La. Ann. 920, this court said:

"His assertion that he believed in his approaching death is not conclusive, and is not the exclusive mode of proving the real condition of his mind."

In the case of State v. Newhouse, 39 La. Ann. 864, 2 South. 799, this court said:

"The true test is evidence showing to the satisfaction of the legal mind that the party making the declaration believed at the time that he was soon to die. The existence of such a consciousness in the mind of the declarant may be shown as effectively by his acts and the circumstances which surround him as by expressions or impressions which he may utter."

Here the conduct of the wounded man, speaking louder than his words, proclaims that he had not given up all hope, and his having given up all hope was a condition precedent to the admissibility of the evidence.

"According to the clear preponderance of authority, if the deceased had the slightest hope of recovery when the declarations were made, they are inadmissible." A. & E. Ency. vol. 10 (2d Ed.) p. 366.

"Any hope of recovery, however slight, existing in the mind at the time of the declarations made, will render the declarations inadmissible." 3 Russell on Crimes (9th Am. Ed.) 252.

"Dying declarations are not admissible in evidence if the declarant had the slightest hope of recovery, although he dies within an hour afterwards." A. & E. Ency. of L. (1st Ed.) vol. 6, p. 115, citing People v. Hodgdon, 55 Cal. 72, 36 Am. Rep. 30.

In R. v. Hayward, 6 C. & P. 157, Tindal, C. J., observed that:

"Any hope of recovery, however slight, existing in the mind of the deceased at the time of the declaration being made, would undoubtedly render the evidence of such declarations inadmissible."

In Rex v. Spilsbury, 7 C. & P. 187, 32 E. C. L. R. 487, Coleridge, J., said:

"It is an extremely painful matter for me to decide upon, but when I consider that this species of proof is an anomaly, and contrary to all the rules of evidence, and that if received it would have the greatest weight with the jury, I think I ought not to receive the evidence, unless I feel fully convinced that the deceased was in such a state as to render the evidence clearly admissible. It appears from the evidence that the deceased said he thought he should not recover, as he was very ill. Now, people often make use of expressions of that kind who have no conviction that their

death is near approaching. If the deceased in this case had felt that his end was drawing very near, and that he had no hope of recovering, I should expect him to be saying something of his affairs, and of who was to have his property, or giving some directions as to his funeral, or as to where he would be buried, or that he would have used expressions to his widow purporting that they were soon to be separated by death, or that he would have taken leave of his friends and relations in a way that showed he was convinced that his death was at hand. As nothing of this sort appears, I think there is not sufficient proof that he was without any hope of recovery, and that I, therefore, ought to reject the evidence."

Rice on Ev., vol. 3, § 335, has the following:

"The doctrine was declared and defined with succinct completeness in the carefully considered case of Reg. v. Jenkins, L. R. 1 C. C. 191. In the following quotation the Chief Baron says: 'The question is whether this declaration, as it now stands, was admissible in evidence. The result of the decisions is that there must be an unqualified belief in the nearness of death—a belief, without hope, that the declarant is about to die. If we look at reported cases, and at the language of learned judges, we find that one has used this expression, "Every hope of this world gone;" another, "Settled, hopeless expectation of death;" another, "Any hope of recovery, however slight, renders the evidence of such declaration inadmissible." We, as judges, must be perfectly satisfied, beyond any reasonable doubt, that there was no hope of avoiding death.'"

In Rex v. Thomas, 1 Cox, C. C. 52, Justice Coleridge said:

"The sense of danger by the deceased, I think, was not of such a character as to preclude some slight expectation that she might recover; and, therefore, on this ground I do not think the evidence was admissible."

In Errington's Case, 2 Lew. 148, Patteson, J., said:

"I have always considered that, in order to a statement being received as a dying declaration, it must be shown that, at the time the deceased made it, not merely that he considered himself in danger, but that he was without hope of recovery. It does not appear to me that the words, 'I think myself in danger,' necessarily exclude the suspicion that the deceased might have nevertheless entertained some hope."

In Matherly v. Com. (Ky.) 19 S. W. 977, it was said that the fact that the deceased asked to have a physician sent for indicates clearly that he entertained a hope of living, although he stated at the time that he was going to die.

In Rex v. Fagent, 7 C. & P. 238, 32 E. C. L. 501, where the declarant expressed an opinion that she should not recover, and at a subsequent part of the same day asked a person whether he thought she would "rise again," it was held that this showed such a hope of recovery as rendered her declaration inadmissible.

In the present case the wounded man did not ask for a physician, but, when the physician did come, he received him in the manner we have stated above, and he asked him what his opinion was; and, upon the physician giving out a hope on the condition of his making a voyage to a distant city, he accepted at once, and acted upon the suggestion.

Under these circumstances, we think that the wounded man had some hope of recovery, and that his declaration should have been excluded.

The last ground is as to the reception of the testimony of Mrs. Rosheger touching a conversation she had with her husband a few hours before the shooting. If, as stated by the learned judge a quo, the defendant was the first to go into this evidence, then the further testimony offered by the state on the subject was properly admitted; but otherwise the evidence was inadmissible. The statements of the husband thus testified to were hearsay, and those of the wife irrelevant.

It is therefore ordered, adjudged, and decreed that the judgment and verdict appealed from be set aside, and that the case be remanded to be proceeded with according to law.

BREAUX, C. J., adheres to the opinion heretofore handed down.