151 So. 770

STATE v. NEWPORT.

No. 32545.

Nov. 27, 1933.

James D. Womack, of Baton Rouge, for appellant.

Gaston L. Porterie, Atty. Gen., James O'Connor, Asst. Atty. Gen., and John Fred Odom, Dist. Atty., and Fred S. Le Blanc, Asst. Dist. Atty., both of Baton Rouge (James O'Niell, Sp. Asst. to Atty. Gen., of counsel), for the State.

ODOM, Justice.

Defendant was prosecuted for murder, convicted of manslaughter, and sentenced to hard labor for not less than ten nor more than fifteen years. From the verdict and sentence she prosecutes this appeal.

This case is brought up on five bills of exception, four of which were reserved to rulings made by the trial judge during the progress of the trial and the other to his refusal to grant a new trial. We shall dispose of these bills in the order as they appear in the record.

A man named Champagne was called as a juror, and, after being examined on his voir dire, was challenged for cause by counsel for defendant. The trial judge refused to sustain the challenge, and bill No. 1 was reserved.

There is no merit in this bill. The juror was asked whether the mere fact that the accused had been indicted created any prejudice in his mind against her. He replied:

"Slightly, if you will permit me to explain. I mean by that, we have a very select body of men, our best citizens, composing our grand jury, who took the testimony and there must have been something to it or she would not have been indicted. However, it is incumbent upon you (the district attorney) to prove her guilty."

On being examined further by counsel for defendant, he said:

"I didn't mean prejudice against her, I meant prejudice against her innocence." He was asked, "That exists in your mind at the present time?" and he said, "To the extent I mentioned."

The juror had already stated that he entertained no opinion as to the guilt or innocence of the defendant, that he would render a verdict in accordance with the evidence and the law as given in charge by the court, and that he could give her the benefit of a reasonable doubt. Later on he explained his position thus:

"I still think there must be some good reason to accuse her of the crime or we would not have her here on trial."

He was then asked:

"Feeling that way then, is there any thing in your mind, is there any thing that would prevent you from giving her the presumption of innocence until she has been proven guilty?" He said, "She is innocent in my eyes until she is proved guilty."

He was asked:

"Your idea about the indictment of this grand jury is that it must have heard some testimony to warrant an indictment?" and he said, "Yes."

Counsel for defendant asked the juror:

"Are you positive that you can disregard this grand jury indictment and not hold that indictment against this woman?" He answered, "Certainly, I am positive of that. I said that the District Attorney must prove her guilty and also that she is the correct person."

It would be hard, indeed, it seems to us, to find a layman who had a better understanding of the duties of a juror than this one. His assumption that the grand jury must have heard some testimony or it would not have returned an indictment was a perfectly natural one. Grand jurors are sworn officers of the court, whose duty it is to inquire into and investigate infractions of the criminal statutes of the state and to prefer charges only when there is sufficient evidence adduced to warrant them. They are so instructed by the court. It is not reasonable to assume that they would prefer charges without some testimony to support them.

For a juror to assume, as this one did, that the grand jury must have had some testimony on which to base the charge does not make him incompetent. The test is whether he would consider the indictment itself as any evidence of guilt. This juror met the test by stating that he would not, but, on the contrary, said, "She is innocent in my eyes until she is proved guilty," and "it is incumbent upon the district attorney to prove her guilty."

Bill No. 2 was reserved to that portion of the district attorney's opening statement to the jury, in which he said:

"In addition to that, the state will give you the dying statement or dying declaration of the deceased."

The objection to this statement was that (quoting from the bill):

"Under the law, before a dying statement or declaration could be admitted to the jury, its admissibility must first be passed upon by the court out of the presence of the jury. And if the court permitted the District Attorney to refer to the dying statement or declaration in his opening statement to the jury, such a procedure would nullify the law governing dying declarations."

The court ruled that the district attorney should, in his opening statement, state in detail what he expected to prove. Whereupon the district attorney stated to the jury that he had the dying statement or declaration of the deceased made according to the formalities prescribed by law, by which, if admitted by the court, he expected to prove "that this woman on trial came out from about or around or near this green house, walked out to the place where deceased had to pass, came up to the deceased and struck her with an iron bar and subsequently shot her; that was done without provocation and without mitigation and the woman died from the effects of the pistol shot."

There is no merit in the objection made by counsel for defendant. It is true, as he says, that, before a dying declaration or statement can be admitted in evidence, it must be affirmatively shown by the state to the satisfaction of the trial judge that such statement was made by deceased while under the solemn conviction of impending dissolution. But the opening statement of the district attorney that he expects to offer such statement in evidence and what he expects to prove by it is one thing, and the introduction of it in evi-

dence is quite another. What the district attorney says in his opening statement about what he expects to prove is not evidence, and cannot be accepted by the jury as such. The trial judge should so instruct the jury, and in this case he did so immediately following the opening statement. He said to the jury:

"Gentlemen, these opening statements made by the District Attorney and counsel for the defense are not statements of facts. They are merely the theory upon which the state bases its case and the theory upon which the defense bases its case. * * * You gentlemen are bound by the testimony of the witnesses who appear in open court and are sworn. The statements made by counsel are not statements that are to affect you in any way whatsoever in your decision of this case and the court so instructs you."

Article 333 of the Code of Criminal Procedure specifically provides that the district attorney shall make an opening statement "explaining the nature of the charge and the evidence by which he expects to establish the same."

■ This court has twice held that the language of the Code is mandatory, that the district attorney must make an opening statement setting forth the nature of the evidence and the facts which he expects to prove in order to establish the offense charged, and that a failure to do so is reversible error. State v. Ducre, 173 La. 438, 137 So. 745; State v. Silsby, 176 La. 727, 146 So. 684.

To hold that the admissibility of a dying statement must be established before being mentioned by the district attorney in his opening statement would be tantamount to holding that it could not be mentioned by him

at all, because the statement must be made prior to the introduction of any evidence.

Under the express terms of the Code, if the district attorney expects to introduce the dying declaration of the deceased as part of the testimony on which he relies for a conviction, he must mention that fact in his opening statement. His failure to do so would be a fatal error.

■ The state offered testimony to show that, on the night prior to the day on which defendant shot deceased, defendant was seen "at the little green house" with a pistol in her hand, and that she said to the witness as he walked up, "Mathilda?" (this being the name of deceased), and that, when witness answered and defendant found that the person approaching was a man, she said, "Oh, I thought you was Mathilda."

Counsel for defendant objected to this testimony on the ground that it was too remote, was irrelevant and immaterial, and served no purpose except to create prejudice against defendant. The objection was overruled and bill No. 3 was reserved.

The court did not err in its ruling. The purpose of the testimony was to show malice and intent. Defendant evidently expected that the woman, Mathilda, whom she killed the next day, would come by the place where she was stationed, and the fact that she was armed indicates that she expected to do her violence at that time.

The district attorney offered to introduce in evidence the dying declaration of deceased, to which the defendant objected on the ground that the proper foundation was not laid. The objection was overruled, and bill No. 4 was reserved.

■ Counsel for defendant contends with great zeal that the state failed to show that the declaration of the deceased, which the state proposed to offer, was made by her under the apprehension of an impending dissolution.

The statement of deceased was taken by a deputy sheriff in the presence of his son and another white man and in the presence of numerous colored persons, who were gathered around the bedside of the wounded woman, among them being her mother and father. The deputy who took the statement and all the others testified that at the time it was made the declarant was apparently sinking, and was so weak that her voice was scarcely audible. They testified further that, prior to making the statement, she declared that she could not survive the wound and expected to die as a result of it. She repeatedly stated then and there that she was in such agony that she could not live.

Counsel's contention is that this statement was not made "in good faith," that is, under the honest belief that she could not survive, but at the suggestion of the members of her family in order to manufacture testimony against the accused, that the wounded woman had been told that, unless she said she expected to die, her statement could not be introduced in evidence.

The circumstances which give rise to counsel's apprehension that the woman had not abandoned hope of living but had said she had, merely to make her statement admissible, are these:

The shooting took place in the morning about 6 o'clock. The woman was picked up and carried to the home of her parents, where later in the day she was interviewed by a deputy sheriff, who was investigating the crime. The deputy questioned her as to the details of the shooting, and told her that he wanted to commit her statement to writing in order that it might be used as evidence. This deputy, it seems, had served a long tenure as such, and was familiar with the rule that, unless such statements are made under the apprehension of approaching death, they cannot be used. He therefore asked her if she expected to die, and she replied, "With the help of the Lord, I will get well."

From this the deputy assumed that she had hope of recovering and did not take her statement, but said to her:

"I told the woman that if she got worse and felt that she was not going to get well, in other words, that she was going to die, for her people to call me and I would come back."

The deputy explained to her and the members of the family that, inasmuch as she had expressed hope of recovery, her statement "would be of no value," and that, in order that a dying declaration might be introduced, it must be made at a time when the declarant had no hope. That was on Saturday morning, the day of the shooting. At that time her voice was strong, the deputy said, "You could hear her around the room."

Late that afternoon she grew worse, and, as some of the colored people expressed it, "She began to sink." She grew steadily worse during that night, and on the following day the deputy was notified of her condition and went to her bedside about 5 o'clock. He found the room filled with relatives and friends of the woman. Her voice was then so "feeble" that she could scarcely be heard

to speak. The deputy requested the colored people to retire. When they did so, he asked the woman if she felt then that she would recover, and she said emphatically that she did not and was going to die. The friends and relatives were called back into the room, and she repeated her statement to them. Her voice was then so weak that they had to get near the bed to hear her. The deputy then took the statement which was admitted in evidence on the trial.

After reading the testimony, we have not the slightest doubt that, when this statement was made and taken down by the deputy sheriff, the declarant had lost all hope of recovery. There is every reason why she should. Her wound was so severe that physicians could not relieve her suffering. She had lost a gallon of blood, and from late Saturday afternoon to 5 o'clock of the next day she had grown so weak that her voice was scarcely audible. Every symptom indicated that death was fast approaching, and there is every reason to believe that the woman herself thought so. The statement was made and taken down in a room where relatives, friends, and the minister had gathered around the bedside—a perfect death scene.

But she did not die until several days thereafter. She seems to have rallied, and was finally carried to a hospital, where she was visited several times by the pastor of her church, who testified that she asked him to pray for her.

Counsel argue that the fact that she wanted to go to the hospital and asked the minister to pray for her indicates that she entertained hope of recovery. But the facts are that she said when she was carried from the house that she would never return alive, and that she wanted to go in the hope that her intense suffering might be relieved and that she would receive better care there than her family could give her at home. She expressed no hope that the treatment she expected to receive there would save her life.

The minister testified that, while she requested him to pray for her, she did not ask that he pray for her recovery, but that he pray "for her soul." Later in his testimony he said that she did not ask him to pray for her soul but that she did ask him to pray for her, and he did "pray for her soul." He says she said to him that "she was glad she got religion in time," all of which indicates that she expected to die.

On the day after she was carried to the hospital, four of her friends visited her, and they say they found her in a cheerful mood, and that she sent the following message to her father:

"Not to worry, she was doing fine, and if she remained on as she was, she would be up and out in a few days."

■ This indicates that she entertained hope of recovery at that time. Even so, that fact does not render inadmissible the statement which she had previously made at a time when she thought death was impending and entertained no hope of recovery.

The rule is that "a declaration, which is competent evidence when made, will not be rendered incompetent by a subsequent temporary revival of the dying person, or by the fact that he afterwards entertained some hope of recovery." 30 C. J. 257, § 499; State v. Robertson, 162 La. 641, 110 So. 888.

Bill No. 5 was reserved to the overruling of a motion for a new trial. This motion presents nothing, except the errors complained of in bills 1, 2, 3, and 4, which have been disposed of already. In addition, it is alleged that the verdict was contrary to the law and the evidence, which presents nothing for review.

For the reasons assigned, the verdict and sentence appealed from are affirmed.

O'NIELL, C. J., absent.