188 So. 718

**STATE v. PRICE.**

No. 35246.

April 3, 1939.

Rehearing Denied May 1, 1939.

John R. Hunter & Son, of Alexandria, and S. R. Holstein, of Winnsboro, for appellant.

David M. Ellison, Atty. Gen., James O'Connor, Asst. Atty. Gen., and A. V. Hundley, Dist. Atty., and Ben F. Thompson, Asst. Dist. Atty., both of Alexandria, for the State.

O'NIELL, Chief Justice.

The defendant was prosecuted for murder and convicted of manslaughter, and is appealing from the conviction and sentence. He shot and killed a man named Charles A. Carruth, in a personal difficulty, and pleaded self defense.

Of the several bills of exception relied upon by the appellant the one that seems most important is one that was reserved to a ruling of the judge allowing a witness, named James Carroll, to testify to a so-called dying declaration made by Carruth soon after he was shot. The importance of the judge's ruling is shown by the facts of the case. Price was one of the range riders employed by the State to enforce the law compelling the dipping of cattle. He and Carruth had had a quarrel about the enforcement of the law some time previous to the fatal difficulty. On the occasion of the shooting, which occurred about ten o'clock at night, Price was visiting a friend and neighbor, named Seals, and was conversing with Mr. and Mrs. Seals and another woman on the porch of the Seals home. Carruth and his wife lived on the other side of the road, almost opposite the Seals house. When the conversation on the Seals porch had been going on some time, perhaps two hours or more, Carruth, who had retired for the night, arose and dressed and went out, into the road, in front of the Seals house, and called to Price to come out. There was a fence and gate on the roadside in front of the Seals house. Price immediately obeyed Carruth's request, and as soon as he had gone a few steps outside of the gate the shooting began. Seals and his wife and the other woman on the Seals porch testified that they could not see or hear what passed between Price and Carruth before the shots were fired; that the shooting came almost immediately after Price had passed through the gate into the road; and that the shots sounded as if there were two shots from a small caliber pistol, in quick succession, and then one shot from a large caliber pistol, and then another shot from the smaller caliber pistol. Price was shot three times and Carruth once. Two of the wounds in Price's body were serious; the other was only a slight wound. Carruth was shot in the abdomen. Immediately after the shooting Carruth walked back to his house, where he was attended to by his wife; and Price walked back to the Seals house, whence he was taken to his boarding house, close by. Price was then taken to a hospital in Alexandria, where he remained under treatment for about a month before being taken to jail. The tes-

timony for Price indicated that the wounds in his body were made by bullets smaller than the one which entered Carruth's body. Price testified that Carruth shot him twice immediately upon his approaching Carruth, and that he then shot Carruth in self defense. Strange to say, when Carruth returned to his house, immediately after the shooting, he had Price's pistol in his hand; and no other pistol was produced or accounted for. It is not known how Carruth got possession of Price's pistol during the difficulty. Mrs. Carruth testified that her husband had no pistol, and that he went to the Seals house unarmed and for the purpose only of quieting Price, who, she said was drunk and was abusing her husband in such a loud tone of voice that she and her husband could hear the abusive language from their house. We understand that this testimony concerning the drunkenness and the abusive language on the part of Price was denied by him and Mr. and Mrs. Seals and the other woman who was on the Seals porch.

Immediately after Carruth returned home, mortally wounded, he asked his wife to send for James Carroll, who, as we understand, was a friend of Carruth. Carroll arrived at Carruth's house within a few minutes after the shooting; and it was then that Carruth made the so-called dying declaration. When Carroll was called as a witness to prove the declaration, the testimony was objected to, on the ground that the State had not proved that Carruth was in the immediate prospect of death, and had no hope of recovery, when he made the declaration. The only evidence on that subject was Carroll's statement that, immediately before Carruth made the so-called dying declaration, he said "he didn't believe he would make it, couldn't make it." That statement of Carroll was made in response to a question propounded to him, as to whether Carruth had said anything "as to whether he expected to live or die." We have no doubt, therefore,—and it is not disputed,—that, when Carruth said that "he didn't believe he would make it, [or] could make it," he did not mean that he did not believe that he could make a dying declaration; what he meant was that he did not believe that he could recover. The judge ruled that that statement on the part of Carruth was sufficient proof that Carruth was in the immediate prospect of death, and had no hope of recovery, when he made the so-called dying declaration to James Carroll. About thirty or forty minutes after making the declaration to Carroll, Carruth repeated it to a witness named Lamar Cooper. But, when Cooper was called by the State as a witness to prove that Carruth had made the so-called dying declaration to him, the attorneys for the defendant renewed their objection, and the judge sustained the objection, for the reason that, soon after making the declaration to Lamar Cooper, Carruth asked to be taken to a hospital, and he selected the hospital which he desired to be taken to, in the town of Lecompte, several miles away. He was taken to the hospital and died there several days afterwards. The declaration which Carroll was allowed to relate to the jury, as the dying declaration of Carruth, was substantially this: That,

just before the shooting, Carruth was in his bed at home, and could hear the loud talking on the Seals porch; that he, Carruth, got out of bed and heard Price say that he, Carruth, had stolen some gas and feed from Price; that Carruth then dressed and went out into the road and called Price out, and asked him who had stolen his gas and feed; and that Price replied: "You,—you G—— d—— baldheaded s—— of a b——", and that Price then flashed his light on Carruth and shot him. Carroll said that Carruth said also that he got Price's gun away from him and shot him with it.

Our opinion is that the declaration which Carruth is said to have made to James Carroll was not a dying declaration, in the meaning of the law. Carruth's statement that he did not believe that he could make it—meaning that he did not believe that he could recover—was far from saying that he was in the immediate prospect of death and had no hope of recovery. Besides, Carruth's statement to the effect that he did not believe that he could recover must be taken in connection with the request which he made, a few minutes afterwards, to be taken to a hospital. In that respect the case is very much like the case of State v. Gianfala, 113 La. 463, 37 So. 30, where it was said:

"Though the wounded man said he thought he was going to die, yet, if he asked the opinion of a physician, and, on his advice, started on a journey to a distant city [85 miles away] to have himself operated on, as being his one chance of recovery, his statements will not be admitted as dying declarations; it not appearing that he was not without some slight hope of recovery."

■ ■ Aside from the decision in the Gianfala case, and aside from the request of the wounded man in the present case to be taken to a hospital for treatment, there was not sufficient proof that he was in the immediate prospect of death and had no hope of recovery. All that can be said of the proof on that subject is that the man believed or feared that he could not recover. But that is not enough to make the declaration of a wounded person, tending to prove the guilt of the one who wounded him, admissible in evidence as a dying declaration. The law on the subject leaves no doubt about the meaning of the term *dying declaration*. It is defined in all of the standard dictionaries substantially—if not exactly—the same as in the law dictionaries. In Webster's New International Dictionary it is defined thus: "A declaration made by a person in the immediate prospect of death, and without hope of recovery." And in Ballentine's Law Dictionary it is defined thus: "A statement made by a person under the fixed belief and moral conviction that his death is impending and certain to follow almost immediately." This essential element in the definition of the term *dying declaration,*—that the declarant must be in the immediate prospect of death and be without hope of recovery at the time of making the declaration,—is affirmed in all of the decisions and opinions of the law writers cited in the opinion in State v. Gianfala, on rehearing, 113 La. pages 483-486, 37 So. pages 37, 38.

The prosecuting attorneys compare the present case with that of State v. Newport, 178 La. 459, 151 So. 770, 773; where it was held that a dying declaration, made at a time when the wounded person had no hope whatever of recovery, was not rendered inadmissible by the fact that the person afterwards did have hope of recovery. In that case, however, the dying declaration was made at a time when the wounded person had no hope of recovery. The court described the scene thus:

"After reading the testimony, we have not the slightest doubt that, when this statement [the dying declaration] was made and taken down by the deputy sheriff, the declarant had lost all hope of recovery. * * * The statement was made and taken down in a room where relatives, friends, and the minister had gathered around the bedside—a perfect death scene."

Our conclusion, that the testimony of James Carroll, repeating what Carruth said to him, as to how the homicide occurred, was not admissible in evidence as a dying declaration, compels us to set aside the verdict and sentence and to grant a new trial.

Two of the remaining bills of exception have reference to remarks made by the prosecuting attorney in his argument to the jury. There is no merit in either of these bills because the judge gave proper instructions to the jury when the attorneys for the defendant complained of the remarks.

Another bill of exception that is not well founded is one that was reserved

to the overruling of an objection to testimony tending to prove that Price was intoxicated and was giving vent to abusive remarks about Carruth a short time after the shooting. This testimony was offset to some extent by testimony of a witness who said that he gave Price a drink of whiskey soon after the shooting, to alleviate his suffering and the shock to his nervous system. The testimony going to show that Price was intoxicated and was indulging in the abuse of Carruth soon after the shooting was admissible because it tended to show the frame of mind of Price at the time of the shooting. Besides, the State's attorneys direct our attention to the fact that, in the abusive remarks which Price made soon after the shooting, he said that Carruth shot him twice before he shot Carruth; and hence, considering all that Price said soon after the shooting,—all of which was given to the jury by the witnesses for the State,—the testimony corroborated the plea of self defense which Price made in his testimony before the jury. The testimony, therefore, as to what Price said soon after the shooting, was not apt to hurt his case before the jury.

The motion for a change of venue was founded upon the allegation that the law compelling the dipping of cattle was very unpopular in the parish in which this homicide occurred, and that there was therefore a bitter prejudice against the range riders, whose duty it was to see that the law was obeyed or enforced. The only evidence in the record, tending to show an undue prejudice against the range

riders generally, in the parish in which this homicide was committed, is the testimony that was taken on the trial of the motion for a new trial. That testimony shows that, on two occasions, during the trial of this case, one of the deputies who had charge of the jury gave way to an outburst which was very abusive of the range riders generally, in the presence and hearing of the jury. That, of course, had not yet occurred at the time when the judge overruled the motion for a change of venue. These expressions by the deputy sheriff, of prejudice against range riders generally, add something to the testimony that was taken on the trial of the motion for a change of venue, tending to show that the defendant might not have a fair or impartial trial in the parish in which this homicide was committed. But our conclusion, from all of the evidence on the subject, is that the defendant is not entitled to a change of venue. The testimony that was taken on the trial of the motion had reference only to the question whether the defendant in this prosecution could get a fair and impartial trial. Twenty-one witnesses were called by the defendant and the same number were called by the State. Fourteen of the defendant's witnesses said that he could not, and two of them said that he could, get a fair and impartial trial; and five of them testified that they had never heard the case discussed, and hence could not give an opinion as to whether the defendant could get a fair and impartial trial. Sixteen of the State's witnesses on this subject said that the defendant could get a fair and impartial trial, and five said that they had never heard

the case discussed. Out of all of the 42 witnesses, therefore, 18 were of the opinion that the defendant could get a fair and impartial trial in the parish, 10 had never heard the case discussed, and 14 were of the opinion that the defendant could not get a fair or impartial trial in the parish. The fact that 10 of the 42 witnesses had not heard any discussion of the case tends to show that there was no undue prejudice against the defendant, as far as this homicide is concerned. We must bear in mind that a witness who testifies that the defendant in any given case cannot get a fair or impartial trial gives nothing more than his individual opinion. And the individual opinions that were given in this case were, necessarily, the opinions of only a very small proportion of the population of the parish. The population of the Parish of Rapides, according to the census of 1930, is 65,455. It does not signify much that 14 men out of a total population of 65,455 are of the opinion that a certain individual who is accused of murder cannot obtain a fair or impartial trial in the parish in which the homicide was committed. A fact which has a tendency to show that there was no undue prejudice among the veniremen in this case is that the attorneys for the defense used only eleven peremptory challenges, and the prosecuting attorneys used twelve, in the empaneling of the jury. Our conclusion is that the evidence on this subject does not warrant the granting of a change of venue. In coming to this conclusion we take it for granted that the presiding judge will see to it that there shall be no repetition of the hostile re-

marks made by a deputy sheriff in charge of the jury, or by any outsider in the hearing of the jury, if the defendant is put on trial again.

 In the defendant's motion for a new trial it was charged that one of the deputies in charge of the jury talked to some of the jurors in an attempt to influence their verdict against the defendant. A member of the jury signed an affidavit to that effect; but, when he was called as a witness on the trial of the motion for a new trial, he said that he stopped the deputy sheriff as soon as he began talking to him, and hence that he, the juror, did not know what the deputy intended to talk about. It was charged also, in the motion for a new trial, that the deputies furnished whiskey to the members of the jury, free of cost. The testimony on this subject shows that the jurors paid for the whiskey that they drank in the jury room during the four days in which they were hearing testimony in the case. They drank five pints of whiskey during the four days; and the distribution among them seems to have been fair enough,—and not calculated to give any one of them too much,—because every member of the jury admitted that he drank some of the whiskey; and they all testified that none of them drank to excess. It is argued that five pints of whiskey distributed equally among twelve men during a period of four days is not enough to make any one of them intoxicated. That seems plausible. It has been decided that the drinking of intoxicating liquor by the members of a jury during the trial of a criminal case

is not a sufficient cause to set aside their verdict, if the drinking was done in moderation and was not accompanied by any misconduct on the part of any juror. State v. Dorsey, 40 La.Ann. 739, 5 So. 26; State v. Bellow, 42 La.Ann. 586, 7 So. 782; State v. Campbell, 134 La. 828, 64 So. 765. In those decisions, however, the court condemned the allowing of jurors to drink intoxicating liquor at all during the trial of a criminal case, and particularly a capital case. We have no doubt that the judge of the district court will see to it that there shall be no drinking of intoxicating liquor in the jury room during a second trial of this case.

The verdict and sentence are set aside, and the case is ordered remanded to the district court for a new trial.

HIGGINS, J., absent.