Statement.
MONROE, J.
The defendants, Joseph, John, aid Charles Daniels, were tried for murder and convicted of manslaughter, and, the conviction having been reversed on appeal, and the case remanded (36 South. 29), they have again been convicted of manslaughter, and have again appealed.
1. They complain, by bill of exception, that a statement was admitted in evidence as a dying declaration when “there was no proof that it was made by the deceased under the belief of fast approaching death or under the sense of impending dissolution.” The statement in question was given in evidence by the attending physician, who testifies as follows:
“Q. Were you with him [referring to the deceased] shortly before and at the time of his death? A. Yes, sir. Q. Did you at any time apprise him of his condition? A. Yes, sir. Q. About how long before? A. The morning of the day he died. He died about eleven o’clock that night. Q. After informing him of his condition, did he, or not, make a statement to you? A. Yes, sir. Q. At that moment did he realize that he would die? A. I think he did. Q. Why do you think so? A. Because he asked me if I could save him, and I told him no; that I could only give him some relief. Q, How did that statement seem to affect him? A. After I told him that he kept quiet and had nothing more to say. Q. Did he ever make the statement that he thought he was going to die? A. Several times he made the statement that if he ever got out of bed he would prosecute the parties that hurt him. Q. Did he so *44 act as to make it appear that he [thought he] was going to die? A. Tes, sir; he led me to believe so by his downcast appearance, but gave no utterance to that effect. Had I expected to appear here, I would have been more explicit with him and told him that he was going to die. He understood perfectly well that he was going to die after I told him so. Q. Before you informed him that you could not cure him, had he inquired from you about his condition? A. Tes; at every visit he asked me how he was. Q. Tou remember any statement he made to you about his condition? A. I don’t remember. Q. As a physician, experienced by the bedsides of patients faced with death, would you say that this man, Oscar Ned, appeared to realize his condition, and that he knew his condition of impending death? (Objected, to, and objection overruled.) A. Tes; he realized it fully. 1-Ie asked me a direct question, could I save him? I told him no, I could not, and that I could only give him relief. He then began to call on God and Jesus, asking mercy. (Or.-ex.) Q. How long before he died? A. On my last visit, I was told that it was two hours after I left that he died. Q. After he began invoking God and Jesus and pleading for mercy, did he make any statement to you? A. No. Q. Did he begin with his invocation immediately after you told him he was going to die? A. I can’t say if it was immediately or not, but it was after. Q. After you told him there was no hope for him, did he make any statement to you? A. Between that time and the time that I told him [you] that I left on my last visit, he made, a statement to me as to who killed him. Q. Was it in connection with his statement that if he got well he would prosecute the parties? A. No, sir; he made that statement in the early part of my visit. He did not seem to doubt my statement that he was going to die. Q. Under what circumstances did he make that last statement to you? A. I asked him if what he had told me on two previous occasions was true, and he made the same statement as on two previous occasions. Q. Did he state, categorically, yes, or did he repeat the same statement? A. At that time I felt very kindly toward Baptiste Daniels and his family, and that was the only reason why I asked him the third time who had shot him. I did it with the intention of trying to free these boys from the trouble, and lie stated, word for word, what he had on previous occasions. Q. Did deceased give other utterances than invocations to God and Jesus, indicating that he was going to die? A. Not that I heard. I was busy fixing up some medicine for him. Q. Did deceased at any time say he knew he was going to die? A. At every visit I made he said something about dying, and asked about his condition. Q. Did he ever say to you that he knew that he was going to die? A. No; I called on him professionally, and not with the intention of getting a dying declaration. (Redirect.) Q. Did he tell you who killed him? A. Tes, sir. Q. Was that after you told him he was going to die? A. Tes, sir; I did not say at any time to the man that he was going to die, but I told him that I could not save him.”
2. A bill of exceptions was reserved to the charge, as follows:
“Be it remembered that on the trial of this cause * * * the district judge, in delivering his charge to the jury, directed them that they could bring in only one of two verdicts, ‘Guilty,’ or ‘Not guilty,’ whereupon the defendants, through their counsel, did timely and promptly except to said charge as being contrary to law, and reserved this bill of exceptions. * * *” (By the Court.) “No charge in writing was requested by counsel for accused. After charging the jury fully upon the law and the different verdicts they could render, the court asked counsel if they had any special charge, and counsel for accused requested three special charges, two of which the court refused because they had already been charged, and one the court charged in the form given, and no bills were reserved by the counsel as to the court’s refusal. The court ordered the jury brought to their room, and, when they were leaving their seats, counsel informed the court that they desired to reserve a bill to a part of the charge of the court, and, after the jury had retired to consider the case, it was then that this bill was reserved. The court charged the jury upon the different verdicts they could render in such a case.”
The matter contained in the foregoing bill is made the subject of motions for new trial and in arrest of judgment, in the former of which it is said that the failure of the court to instruct the jury “that either or all of the accused could be acquitted, and that the jury could render a verdict convicting one of your movers herein and acquitting the others, or convicting only one of your movers whom they might deem guilty,” was contrary to the law and prejudicial to them.
Opinion.
1. In order to establish a basis for the introduction of a dying declaration, the state must prove that the decedent was in ex-tremis, that he was fully conscious of his condition, and that he made the declaration while under a sense of impending death, and after having abandoned all hope or expectation of recovery. It seems evident that when the decedent whose declaration is here relied on “several times made the statement .that if he ever got out of bed he would prosecute *45 tlie parties who had hurt him,” he was not in that frame of mind. The question then is, has the state proved the condition of his mind — what he believed and what he expected or hoped, and what he did not expect or hope — when he subsequently made the declaration which is offered as his dying declaration? He was subsequently told by his attending physician that he (the physician) could not cure him, and the physician was impressed with the belief that the statement so made by him carried to the mind of his patient the conviction that he (the patient) must die. We are not, however, informed as to the nature of the latter’s injury, save that it resulted from a gunshot wound or wounds, or whether he was informed or believed that death was imminent. The physician testifies that he did not tell him in so many words that he was going to die; neither, as it appears, did he tell him how long he was likely to live. That the deceased was in extremis is proved by the result, since he died about two hours after the physician last left him, but did he know that death was thus imminent? If so, the record fails to show it. Dying, as he was, of a gunshot wound inflicted, so far as we know, whilst he was in perfect health, he may well have 'reached the boundary of the other vorld without realizing his position. When told that his physician could not cure him, he may have feared death, or he may have believed what was told him; but the fear that he would die would not furnish a basis for the introduction in evidence of a dying declaration, nor would the belief that his physician could not cure him, since it would not in either case follow that he believed that death was presently impending. It will not do, however, for other reasons, to say that he may have believed that his physician could not cure him. The burden rests upon the state to prove that he did so believe, and moreover that he believed that no other physician could cure him. And it is not easy to prove what a man believes, and still less so, perhaps, what he hopes, for we hope on even after, as a matter of reason, we have ceased to hope; and where the question is one of life and death to a man who has been suddenly stricken down, who has still something to live for, and whose mind is busy with the idea of prosecuting those by whom he has been injured, proof that the last spark of hope has left his breast can hardly be considered convincing unless it comes in the form of a specific admission to that effect by word or sign from the man himself, since no one else can know. In this case there was no specific oral declaration or admission from the deceased that he believed death to be near, or that he had ceased to hope that he would recover. When he was told that his physician could not cure him, he said nothing. At another time, as we understand the testimony, he asked God and our Savior to have mercy on him. The witness says:
“He led me to believe so [that he believed he was going to die] by his downcast appearance, but gave no utterance to that effect.”
It is not, however, necessary to assume that deceased believed that he was going to die for the reasons thus given, since there are many persons who pray for mercy and are downcast in appearance as the result of trifling visitations. The witness does not tel] us that the deceased at any time called for his family or his priest, or that he undertook to arrange his worldly affairs, if there were any to arrange, or that he did anything more than has been stated; and that which he did was not, in our opinion, inconsistent with the hope of recovery. In State v. Spencer, 30 La. Ann. 362, it appeared that the deceased was shot in the abdomen; that his bowels were protruding; that, being placed in bed, he stated who had shot him; that he told the witness to pray for him, “and immediately afterwards he called his children around his bedside and hade them good-by, and said *46 to his wife, ‘Take care of the children as best she could.’ He then became speechless and died.” This court said:
“Dying declarations are admissible only when it appears that they were made under a sense of immediate and impending death. The actions and declarations of the deceased must manifest his consciousness of, and belief in, speedy dissolution.” Citing Greenleaf, vol. 1, § 158; Archbold, vol. 1, p. 140.
And it was held that the declaration in question was properly admitted.
In State v. Trivas, 32 La. Ann. 1088, 36 Am. Rep. 293, it appeared that the deceased stated “that he was going to die; that he was resigned to die; that this was his last; that he asked and obtained religious consolation as a preparation for death, and gave instructions as to his worldly affairs, to be carried out after his death.” And the declaration was held to have been properly admitted.
Upon the other hand, in State v. Gianfala (La.) 37 South. 30,[1] it was held (quoting from the syllabus):
“Though the wounded man said he thought he was going to die, yet, if he asked the opinion of a physician, and, on his advice, started on a journey to a distant city to have himself operated on, as being his one chance of recovery, his statements will not be admitted as dying declarations; it not appearing that he was not without some slight hope of recovery.”
And the conviction was set aside.
In State v. Parham, 48 La. Ann. 1309, 20 South. 727, to which we are referred by the Attorney General, the only question decided was as to the form of the declaration; and it was held that “a declaration made by a person in articulo mortis, reduced to writing by his attending physician, signed by the deceased, and his signature attested by a justice of peace,” was admissible.
In State v. Ashworth, 50 La. Ann. 94, 23 South. 270, to which we are also referred by counsel for the state, the declaration was offered on behalf of the accused; and, whilst it was shown that the deceased had said that he could not live much longer and that he was bound to die, it was held that the rules of evidence on the subject of the admission of such declarations are not to be so rigorously applied when the fact that the declaration has been made is established and it is in favor of the accused as when it is offered against him.
In State v. Sadler et al., 51 La. Ann. 1397, 26 South. 390, to which we are likewise referred by the prosecution, it appeared that the deceased, who was then in the hospital, mortally wounded and unable to raise himself up, said, “Journee, I am gone,” after which he made a declaration which was held to have been properly admitted, but that on the following day he made a declaration which was not shown to have been made under a sense of impending dissolution, was not offered as a dying declaration, and was not admissible as such or upon any other account.
These cases in no manner conflict with the conclusion reached by us, which is that the declaration offered in the instant ease was improperly admitted.
2. The bill of exceptions to the judge’s charge leaves us in some doubt as to the facts. It is to be regretted that our learned Brother does not state distinctly whether the charge which is made the subject of the objection was given by him or not. The defendants were certainly entitled to have the jury instructed that they might convict one or more of the three accused without convicting or acquitting the other or others.
For the reasons assigned, it is ordered, adjudged, and decreed that the verdict and sentence appealed from be set aside and annulled, and that this case be remanded to be proceeded with according to law; the accused to remain in custody until legally discharged.

 113 La. 463.