338 So.2d 1376 (1976)
STATE of Louisiana
v.
Harold Joseph VINCENT.
No. 57947.
Supreme Court of Louisiana.
November 8, 1976.
*1378 F. Clay Tillman, Jr., Tillman & Mitchell, Leesville, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., William C. Pegues, III, Dist. Atty., Ted R. Broyles, First Asst. Dist. Atty., for plaintiff-appellee.
SUMMERS, Justice.
A true bill was returned on September 22, 1971 by the Vernon Parish grand jury charging defendant, Harold Joseph Vincent, with the murder of Lonnie Barrow. La. Rev.Stat. 14:30. He entered a plea of not guilty and not guilty by reason of insanity, was convicted and sentenced to life imprisonment, the sentence to run consecutively to other sentences he was then serving. Thirteen assignments of error are presented in support of his appeal.
While driving near Lake Charles, Louisiana, on August 27, 1971, Lonnie Barrow picked up the defendant Vincent who was hitchhiking. Barrow drove his 1971 Ford Mustang to a care in Ragley, Louisiana, bought Vincent food and left him with instructions that if he remained there until he returned Barrow would drive him to De-Ridder, Louisiana. Approximately forty minutes later Barrow returned. Finding Vincent at the cafe, he picked him up for the trip to DeRidder.
*1379 As they neared DeRidder, Vincent pulled a gun on Barrow and forced him to drive east of Rosepine on "Ikes Road." Once there, at gunpoint, Vincent made Barrow turn on a dirt road, and finally into a wooded area on an obscure logging road near a trash dump. Vincent then robbed Barrow of his wallet and car keys, made him remove his shirt and told him to see how far he could walk before he shot him. As Barrow reached a point 25 or 30 feet away, Vincent shot him twice. When Barrow fell to make Vincent believe he had been killed, Vincent walked up and shot him again.
Vincent then fled in Barrow's car, driving to the outskirts of Chicago, Illinois. There he picked up two hitchhikers and drove to Las Cruces, New Mexico, where he was arrested on September 3, 1971 for possession of a stolen automobile, Barrow's Mustang. He waived extradition and was returned to Vernon Parish, Louisiana, to stand trial for the murder of Lonnie Barrow.

Assignment 1
Defendant filed an application on December 6, 1971 for the appointment of a sanity commission to examine him and inquire into his present capacity to proceed and his mental condition at the time of the offense. The motion also requested permission to change defendant's not guilty plea to not guilty and not guilty by reason of insanity.
The request to change the plea was granted but, because no showing was made in support of the request for the mental examination, the trial judge refused that request saying:
"the defendant has only recently undergone such examination in connection with charges pending against him in the Fourteenth Judicial District Court in and for the Parish of Calcasieu at Lake Charles, Louisiana, and at said hearing was found to have the present capacity to proceed."
When a defendant enters a combined plea of "not guilty and not guilty by reason of insanity" the trial judge may appoint a sanity commission. La.Code Crim.Pro. art. 650. The matter is one which rests in the court's sound discretion, and there must be reasonable grounds to doubt the defendant's mental capacity to proceed. La.Code Crim.Pro. art. 643.
The accused bears the burden of establishing by a clear preponderance of the evidence reasonable grounds for the judge to believe that he is mentally defective or was at the time of the offense. State v. Johnson, 249 La. 950, 975, 192 So.2d 135, 145 (1966), cert. denied, 388 U.S. 923, 87 S.Ct. 2144, 18 L.Ed.2d 1374 (1967); State v. Graves, 247 La. 683, 174 So.2d 118 (1965).
And when, as here, the matter is presented by bare allegations without supporting evidence, the exercise of discretion conferred on the trial judge will not be disturbed.
Refusal of the motion was not an abuse of discretion on the part of the trial judge under these circumstances.

Assignment 2
Notwithstanding the lack of substance in defendant's December 6, 1971 application for appointment of a sanity commission, the trial judge, on further application, subsequently appointed a sanity commission, and a hearing was held on January 21, 1972. Defendant objected at the hearing that the experts appointed to examine the defendant did not file their reports timely within thirty days as required by Article 645 of the Code of Criminal Procedure. The objection was sustained.
Thereupon the trial judge appointed a second sanity commission, fixed a date for a hearing and extended the time for filing the report of the sanity commission. On September 8, 1972 a hearing was held at which the trial judge concluded that still another sanity commission had to be appointed.
Dr. A. T. Butterworth, the consulting psychiatrist at Louisiana State Penitentiary, was then appointed as a third sanity commission on January 30, 1973. La.Code Crim.Pro. art. 644 (1966). He reported to the trial judge more than thirty days later, *1380 on March 6, 1973, that after a series of tests and several interviews, he had determined that the defendant was unable "to meet the standards of triability". No action was taken on this report. A year later, however, during which defendant underwent treatment while serving another sentence in the State penitentiary, Dr. Butterworth reported that defendant was then able to stand trial and assist counsel in his defense. At a sanity hearing on April 5, 1974 the judge found that defendant had the capacity to proceed.
As the defense contention is understood, the finding on defendant's mental condition was not made in accordance with the rules prescribed in the Code of Criminal Procedure. specifically, the contention is aimed at the failure to comply with the requirement of Article 645 that "[t]he report of the sanity commission shall be filed in triplicate with the presiding judge within thirty days after the date of the order of appointment."
While formal written extensions of time for filing the examination and report were not entered in the record, it is apparent that the delay allowed was approved by the trial judge. The time lapse between Dr. Butterworth's appointment and the final report was also due to the series of examinations, tests and treatment to which defendant was subjected.
Article 645 does fix a time for the report to be filed, however, it is noted that the article also provides that "[t]he time for filing may be extended by the court." Otherwise, the Code does not impose time limitations for the conduct of the examination, the fixing of the hearing or the determination of defendant's mental condition. While defendant contends that there was a failure to file the report timely, he does not set forth how he was prejudiced by the untimely filing; nor does defendant negate the implication from this record that the trial judge granted additional time for the examination and the preparation and filing of the report. And defendant does not complain that copies of the reports were not furnished to him promptly when filed. Any error which occurred was therefore technical, insubstantial and harmless. La.Code Crim.Pro. art. 921.
Another objection is made under this assignment of error. Because some of the examinations and treatment to which defendant was exposed were performed by persons other than Dr. Butterworth, the appointed physician, their findings and results of their tests are said to be inadmissible as hearsay. Dr. Butterworth testified that these persons comprised his "team" and that he supervised their work and reviewed their findings.
On the basis of Article 647 of the Code of Criminal Procedure and Section 425 of Title 15 of the Revised Statutes, this Court held in State v. Forbes, 310 So.2d 569 (La.1975) that the report of the sanity commission, which these statutes make admissible in evidence,
". . .is a reasonable exception to the hearsay rule. There is a logical basis for assuming that the report is trustworthy since it is made under the order of the court. The professionals involved in making the report do not have any interest in the case. The defendant, prosecution and the court have the right to subpoena the doctors who made the report, put them on the stand under oath, examine them and cross-examine them as to the accuracy of the report."
Medical experts appointed by the Court are expected to avail themselves of tests and examinations performed by others in arriving at their opinions.
There is no merit to this assignment.

Assignment 3
Article 431 of the Code of Criminal Procedure provides:
"The grand jurors shall take the following oath when impaneled:
"`As members of the grand jury, do you solemnly swear or affirm that you will diligently inquire into and true presentment make of all indictable offenses triable within this parish which shall be given you in charge, or which shall otherwise come to your knowledge;

*1381 that you will keep secret your own counsel and that of your fellows and of the state, and will not, except when authorized by law, disclose testimony of any witness examined before you, nor disclose anything which any grand juror may have said, or how any grand juror may have voted on any matter before you; that you will not indict any person through malice, hatred, or ill will, nor fail to indict any person through fear, favor, affection, or hope of reward or gain; but in all of your indictments you will present the truth, according to the best of your skill and understanding?'
"The oath shall be read to the grand jury by the clerk, who shall then ask each juror: `Do you take this oath or affirmation?'
"The oath shall be administered to every grand juror appointed to fill a vacancy in the grand jury and to every grand juror who was not present at the taking of the oath by the grand jury."
A defense motion to quash was filed in which it was alleged that
"the oath administered to the grand jurors was not that prescribed by Article 431 of the Code in that the words `SO HELP ME GOD', were added thereto, thus making a belief in God the criterion for serving on said Grand Jury, contrary to constitution of the United States of America and the Louisiana Constitution . . ."
It is the defense contention that the oath prescribed by Article 431 is mandatory; and, therefore, it was impermissible to change the oath by adding "SO HELP ME GOD". The motion to quash was denied and the ruling is assigned as error.
There is no showing that the grand jurors were compelled to swear to the oath with the added phrase, SO HELP ME GOD. It may be inferred that had they objected, they could have affirmed instead of swearing. The prescribed oath with the added phrase is a matter which more properly concerns the individual grand jurors. Defendant's standing to object to the use of the phrase, so long as the oath was otherwise properly administered, is doubtful. The trial judge found the controverted phrase to be surplusage to the oath and use of it to be harmless error.
There is no merit to this bill.

Assignments 4 and 11
A motion was filed to suppress defendant's typewritten, inculpatory statement given in Las Cruces, New Mexico and a taped statement given in Vernon Parish on this return to Louisiana to stand trial. The taped statement given in Vernon Parish was never used in evidence and that issue is moot.
The statement at issue was given by the defendant after his arrest by the Las Cruces, New Mexico police, approximately seven days after the murder. It is objected to because the State was permitted to introduce uncertified copies which defendant contends are not the "best evidence." La. R.S. 15:436. Apparently following a federal practice, the Las Cruces police retained the originals of written statements for one year only. After that time, and prior to destroying the originals, the police made microfilm copies of all statements, retaining only the microfilm.
The trial judge permitted introduction of a copy of the document made from the microfilm on the ground that a police officer testified that the copy introduced was exactly like the original statement made to him by defendant.
The ruling was correct. Where the document offered in evidence is a mechanical reproduction of the original, and is its substantial equivalent, it is admissible unless it can be shown by the defendant that its content does not accurately reflect the original. State v. Jackson, 296 So.2d 320 (La.1974); State v. St. Amand, 274 So.2d 179 (La.1973).
Another objection involves the contention that the State failed to prove the chain of custody of the copy.
The Las Cruces police officer testified in detail how the original was stored for one *1382 year; that it was thereafter microfilmed and destroyed, and how copies were made from the microfilm. While the chain of custody of the microfilm after the copy was made was incomplete, the chain of custody of the copy made from the microfilm was well supported.
Defendant's third and last contention under these assignments of error is that the statements made in New Mexico were not free and voluntary. He testified that he was deprived of food and medical attention until he agreed to give the statement. At the hearing on this question, defendant's testimony was refuted by two police officers who were present at the time of the interrogation. In addition, they testified that defendant had been given his Miranda warnings, and that he signed a Miranda waiver form which was introduced in evidence.
From this record it is shown that the State affirmatively proved that defendant freely and voluntarily confessed, and the demands of the law are satisfied. La.Const. art. I, § 11 (1921); La.R.S. 15:451; State v. Shelby, 308 So.2d 279 (La.1975).

Assignments 5 and 6
It is the defense contention here that the trial judge erred in allowing the jury to leave the courtroom to view decedent's car and in denying the defense motion for a mistrial when jurors disregarded the judge's instructions while viewing the car.
Article 762 of the Code of Criminal Procedure authorizes the trial judge to remove the trial to places within the parish other than the courthouse, in his discretion,
"(2) [t]o allow the jury or judge to view. . .an object which is admissible in evidence but which is difficult to produce in court. At this view, the court shall not permit the taking of evidence except in connection with the place or object. . . ."
No abuse of the trial judge's discretion is demonstrated here. Before the jury viewed the car, the trial judge instructed them as to their conduct at the viewing. Moreover, he said, they should consider the depreciation the car must have undergone during the three-year interval since the offense occurred. The defense does not point out how the jurors violated the standards set forth in Article 762 or in what manner they failed to carry out the judge's instructions.
The contention that the State failed to establish a sufficient chain of custody of the car is equally without merit. Before the jury was allowed to view the car, decedent's father, James Barrow, testified that after his son's murderer was arrested, the Vernon Parish Sheriff's office turned the car over to him. Although the decedent was the owner of the car, having purchased it with money he earned, it was registered in his father's name because decedent was only seventeen years of age. Documentary proof of ownership was entered into the record. James Barrow also testified that the car had remained in his custody since, and it was the same car which he drove to the courthouse on that day at the request of the District Attorney.
An adequate chain of custody was established. State v. Dotson, 260 La. 471, 256 So.2d 594 (1971).

Assignments 7 and 8
James Richman testified for the State that on August 27, 1971 he was driving on Ikes Road when he encountered Lonnie Barrow walking down the road. Barrow flagged him, and when he saw blood on Barrow's back he stopped. When Richman attempted to relate what Barrow told him, the defense objected that it was hearsay, but the objection was overruled and Richman was permitted to testify.
Richman testified that Barrow asked if he would take him to a hospital. Richman agreed, let Barrow into his truck and started back to the hospital. On the way he saw people sitting on the porch of a house and obtained permission to use their phone to call an ambulance. The ambulance was summoned. The trial judge was of the opinion that Barrow's utterances under *1383 these circumstances were part of the res gestae.
Ruby Frazier also testified for the State. She was present at her house when Richman stopped to summon the ambulance. Barrow was helped out of the truck, and she provided a quilt for him to lay on while awaiting the ambulance. When she was asked what Barrow said to her, the defense objected that this would be hearsay. The argument was that Barrow's statements could not come within the res gestae exception to the hearsay rule because of the elapsed time since the shooting and because of the distance from the scene of the crime. Evidence established that Barrow walked approximately one-quarter mile from the scene of the shooting to the point where Richman picked him up. Richman then drove another quarter of a mile to the Frazier house. The objection was overruled.
The witness then testified that Barrow told her of the events leading to the shooting.
". . . that he had been forced at gunpoint to drive into the words; that he had been asked to take off his shirt; that his wallet and car keys had been taken from him; that the guy with the gun had told him to run to see how far he could go before the bullet hit him; he said that when the bullet hit him he fell, he got up and started to run again and the man shot him again, so he laid still; he wanted the man to think he was dead so he would leave him alone. And then he said the man came up to him and shot him a third time while he was laying on the ground. And he said he didn't want to die back there where there was no one to see him or to find him; that he had to try to make it to the road so he crawled to the road and he remembered seeing a farm house and he started in that direction and the man with the pick up truck stopped and picked him up. He described his car. He said it was a yellow Mustang with a racing stripe. He described the man, said he was average build, average height, brown hair, said he had tatoos on his hands. And then he started talking about his girl friend; he gave us his father's phone number; he gave us the license number on his car. During this time we tried to get him to lie still, to lie quiet and rest. He said, "No, I've got to tell it all while I can."
Several hours after this declaration Barrow died in the hospital after undergoing heroic surgery in an effort by the doctors to save his life.
Insofar as the testimony of Richman is concerned, the statements made by the deceased were innocuous, consisting only of Barrow's plea to be taken to a hospital. The fact of Barrow's wounds and hospitalization are virtually uncontested, and Richman's recitation of Barrow's conversation contained no reference to the defendant.
Ruby Frazier's testimony is hearsay and extremely prejudicial to the defendant. It must fall within an exception to the hearsay rule to support the ruling of the trial judge.
The hearsay rule is one of the broadest in the field of evidence and yields to numerous exceptions that over the years have become as well established as the rule itself. La.R.S. 15:434 and 463. Two of these involve 1) statements of a deceased person in contemplation of death, commonly known as "dying declarations", and 2) res gestae which is defined in our law as events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants. The circumstances and declarations must be necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction. La.R.S. 15:447-48.
A dying declaration is one made by a person in the immediate prospect of death and without hope of recovery. Cf. La.Code Crim.Pro. art. 482. State v. Hodgeson, 305 So.2d 421 (La.1974); State v. Jacobs, 281 So.2d 713 (La.1973); State v. Price, 192 La. 615, 188 So. 718 (1939).
*1384 Although the courts have not found it easy to determine just when a declaration is admissible as a part of the res gestae, each case depending upon its particular circumstances, the tendency is to extend rather than narrow the scope of res gestae to promote the ascertainment of truth. As a result, incidents offered as res gestae may be separated from the act by a lapse of time more or less appreciable, provided they grow out of and are in a legal sense immediately connected with the litigated act. State v. Curry, 263 La. 997, 270 So.2d 484 (1972); State v. Reese, 250 La. 151, 194 So.2d 729 (1967).
While Barrow's declarations to Ruby Frazier as he lay mortally wounded awaiting the arrival of the ambulance may fall within the res gestae exception, they definitely fulfill the requisites of dying declarations and, as such, are admissible as exceptions to the hearsay rule. Not only were the statements made in the immediate prospect of death, Barrow having died several hours thereafter in a nearby hospital, but the dying declaration also reveals that Barrow had no hope of recovery. Ruby Frazier's testimony makes this evident: "During this time we tried to get him to be still, to lie quiet and rest. He said, `No, I've got to tell it all while I can'."

Assignments 9 and 13
Defendant contends that the trial judge erred in admitting photographs of the scene of the crime (assignment 9) and of the victim (assignment 13) in that no proper foundation, chain of control or possession was established.
With reference to the photographs depicting the scene of the crime, the objection is that without the testimony of the photographer to explain the location of the scene photographed the photographs were not shown to be relevant. Although the photographer did not testify, the State did call Deputy Frank Howard who testified that he supervised the taking of the pictures by the photographer, and he appears in one of the pictures. He explained the location of the scene.
It is not essential that the photographer verify the pictures to establish a proper foundation for their admission in evidence. State v. Browning, 290 So.2d 322 (La.1974); State v. Fox, 251 La. 464, 205 So.2d 42 (1967). Deputy Howard's presence on the scene at the time of the picture-taking suffices to provide the foundation necessary for the introduction of the photographs into evidence.
Pictures of the decedent taken by William Guidry, a deputy sheriff and identification officer, are said to be inadmissible because they were not continuously in his possession and control. He identified the photographs at the trial as those he took at the hospital shortly after Barrow's death. He developed the film and delivered the negatives to the Calcasieu sheriff's office and turned the prints over to his supervisor. He had not again seen the photographs until the day of the trial. He stated categorically that the photographs were the ones he had taken and that they had not been altered since they were developed.
This identification of the photographs by the photographer at the trial is entirely adequate to permit them to be admitted into evidence. State v. Nance, 315 So.2d 695 (La.1975); State v. Sears, 298 So.2d 814 (La.1974).

Assignment 10
In identifying certain of the photographs taken at the scene of the crime Deputy Howard said ". . .that's my picture in itmine and Snake James Ersel James pointing to blood stains. . . ." When this occurred, defenses counsel moved for a mistrial which was denied. The defense maintains that Howard's testimony voluntarily identifying the spot on the ground as a blood spot was extremely prejudicial. His testimony was, moreover, according to the defense, opinion testimony which Howard had not been qualified to express.
It was permissible for the witness to explain the actions of the subjects in the photograph. Furthermore, this Court has *1385 held that blood is familiar to everyone and expert opinion and analysis is not required to identify that substance. State v. Jones, 315 So.2d 650 (La.1975); State v. Skipper, 284 So.2d 590 (La.1973).
No prejudicial conduct resulted from this ruling which made it impossible for the defendant to obtain a fair trial. To the contrary, Howard's testimony was permissible. La.Code Crim.Pro. arts. 770, 771, 775.

Assignment 12
Reversible error is claimed by the defense because the trial judge permitted the introduction of the coroner's report and the proces verbal of the autopsy without a proper certification and without the testimony of the coroner to verify their authenticity; and, also, because the judge permitted his law clerk to read portions of the coroner's report and proces verbal of the autopsy to the jury.
At the trial, the District Attorney sought to introduce a copy of the coroner's report and the proces verbal of the autopsy with leave to substitute a certified copy. Defense counsel objected because the documents were not properly certified and because the coroner's report and proces verbal of the autopsy were made in November 1971 and were not filed with the District Attorney within ten days after the offense, as required by Article 105 of the Code of Criminal Procedure and Section 1565 of Title 33 of the Revised Statutes.
Neither the coroner's testimony nor the certification of the coroner's report was required to prove the victim's death. That fact could be established by any competent evidence, and proof of death was made otherwise at this trial. Introduction of the coroner's report and the copy of the proces verbal of the autopsy was merely cumulative and added little to the proof of death. The defense objection is rendered even less valid by the fact that the trial judge permitted the jury to hear only those portions of the report and proces verbal which pertained to death, the cause of death and time of death. La.Code Crim.Pro. art. 105; State v. Holmes, 258 La. 221, 245 So.2d 707 (1971).
The objection relating to the timely filing of the report and process verbal with the District Attorney is also without merit. Article 105 of the Code of Criminal Procedure, as we said in State v. Allen, 273 So.2d 504 (La.1973), "is designed primarily to provide the flow of information needed by the office of the district attorney in cases of apparent homicide . . . Non-compliance with its provisions has no bearing upon the requirements of due process."
Any error which occurred by the State's failure to verify the report and the process verbal by certification, or by the testimony of the Coroner, was not a substantial violation of a statutory or constitutional right. La.Code Crim.Pro. art. 921.
For the reasons assigned, the conviction and sentence are affirmed.
DENNIS, J., concurs, but does not agree with the characterization of the hearsay statement as res gestae or the remarks regarding extension of the scope of res gestae.