STATE OF LOUISIANA

VERSUS

SIDNEY SIMONEAUX

NO. 23-KA-400

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 21-5977, DIVISION "O"
HONORABLE DANYELLE M. TAYLOR, JUDGE PRESIDING


July 10, 2024


**JUDE G. GRAVOIS**
**JUDGE**


Panel composed of Judges Susan M. Chehardy,
Fredericka Homberg Wicker, and Jude G. Gravois


**AFFIRMED; REMANDED WITH INSTRUCTIONS**
**JGG**
**SMC**
**FHW**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
  Honorable Paul D. Connick, Jr.
  Monique D. Nolan
  Thomas J. Butler
  Joan Benge
  LaShanda Webb

COUNSEL FOR DEFENDANT/APPELLANT,
SIDNEY SIMONEAUX
  Bertha M. Hillman

**GRAVOIS, J.**

Defendant, Sidney Simoneaux, appeals his convictions of two counts of aggravated rape upon a known juvenile (DOB 10/02/1990) in violation of La. R.S. 14:42[1] (counts one and two); one count of aggravated oral sexual battery upon a known juvenile (DOB 10/02/1990) in violation of La. R.S. 14:43.4[2] (count three); and one count of sexual battery upon a known juvenile (DOB 10/02/1990) in violation of La. R.S. 14:43.1 (count four). On appeal, defendant argues the trial court erred in denying his pretrial Motion *in Limine* to exclude video evidence. Finding no merit to the assignment of error, we affirm defendant's convictions and sentences. However, the trial court failed to advise defendant, at his sentencing, of the mandatory requirements for registration as a sex offender. We accordingly remand the matter to the trial court with instructions to the trial judge to inform defendant of the registration requirements for sex offenders by sending appropriate written notice to defendant and to file written proof in the record that defendant received such notice. We also remand for correction of the Uniform Commitment Order and minute entry as set forth in our errors patent review.

**PROCEDURAL HISTORY**

On February 10, 2022, a Jefferson Parish Grand Jury indicted defendant, Sidney Simoneaux, on the aforementioned charges, to which he pled not guilty at his arraignment on February 22, 2022. In the indictment, the State alleged the following: in count one (aggravated rape upon a known juvenile), the offense occurred on or between October 2, 1995 and October 1, 2002; in count two (aggravated rape upon a known juvenile), the offense occurred between August 15, 2001 and October 1, 2002; in count three (aggravated oral sexual battery upon a known juvenile), the offense

---

[1] La. R.S. 14:42, as amended by La. Acts 2015, No. 184, § 1, effective August 1, 2015, now classifies aggravated rape as "first degree rape." Subsection E of the amended statute provides that "[a]ny act in violation of the provisions of this Section committed on or after August 1, 2015, shall be referred to as 'first degree rape.'" The incidents in this case occurred prior to August 1, 2015.

[2] Aggravated oral sexual battery was repealed by Acts 2001, No. 301, § 2. The crime of female genital mutilation, added by Acts 2012, No. 207, § 1, currently bears the statutory designation of La. R.S. 14:43.4.

occurred between October 2, 1995 and August 14, 2001; and in count four (sexual battery upon a known juvenile), the offense occurred between October 2, 1995 and October 1, 2003. Also, as to count four, the indictment states that defendant committed sexual battery to wit: "the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, and/or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim."

On September 23, 2022, defendant filed a Motion *in Limine* to Exclude Video Evidence and Supporting Memorandum.[3] The State filed an opposition to the defense's Motion *in Limine* on September 29, 2022. On January 5, 2023, after a hearing was held, the trial court denied defendant's Motion *in Limine*. On March 6, 2023, the case proceeded to trial before a twelve-person jury, and on March 8, 2023, the jury found defendant guilty as charged on all counts.

Defendant filed a motion for a new trial on March 15, 2023, which was denied that same day. On the same day, after a waiver of delays, the court sentenced defendant to life imprisonment without the benefit of parole, probation, or suspension of sentence on each of counts one and two. On count three, the court sentenced defendant to fifteen years imprisonment in the Department of Corrections, with that sentence to run concurrently with the other two sentences. On count four, the court sentenced defendant to ten years imprisonment in the Department of Corrections, with that sentence to also run concurrently with all other sentences. Immediately thereafter, the defense made an oral motion to reconsider sentence, which was denied. Defendant now appeals, challenging the denial of his Motion *in Limine* to exclude video evidence.

---

[3] Other pleadings were filed in this case. Because these filings are not related to the assigned error, they are not discussed herein.

## FACTS ESTABLISHED IN THE TRIAL COURT

This case involves allegations made by B.W.[4] against her step-grandfather, Sidney Simoneaux (defendant). She primarily lived with him and her grandmother, Ginny Simoneaux, in a duplex on Kingston Street in Kenner, Louisiana. On the other side of the duplex resided her father, John Raley, III, and Dawn Raley, her stepmother.

Officer Byron Schilling with the Kenner Police Department was dispatched to the police station on September 11, 2021 regarding a complaint of child sexual abuse. The victim, B.W., now an adult, told Officer Schilling she possessed a video of defendant, her "step-grandfather," admitting to "oral sexual conduct as well as fooling around with her" when she was approximately five or six years old. B.W. indicated defendant "sexually assaulted her or/and raped her on multiple occasions." After viewing the video, Officer Schilling notified his supervisor and forwarded the case to the detective bureau.

B.W. was born on October 2, 1990. She lived in Kentucky with her mother and father (John Raley, III),[5] and her sister, who was born there on February 15, 1995. Her mother passed away during her sister's birth.[6] Afterwards, when B.W. was approximately four or five years old, her family moved to a duplex on Kingston Street in Kenner, Louisiana. B.W. regularly stayed on the side of the duplex where her grandmother, Mrs. Simoneaux, and defendant[7] resided, sharing a bedroom with her sister.[8]

At trial, B.W. testified defendant sexually violated her on multiple occasions, beginning when she was approximately five or six

---

[4] In the interest of protecting minor crime victims and victims of sexual offenses as set forth in La. R.S. 46:1844(W)(3), we will use only initials to identify the victim and any defendant or witness whose name can lead to the victim's identity (*i.e.*, parent, sibling, or relative with the same last name as the victim). *State v. E.J.M., III*, 12-774, 12-732 (La. App. 5 Cir. 5/23/13), 119 So.3d 648, 652 n.1.

[5] B.W. considered Mr. Raley her biological father, though it appears he is not.

[6] B.W. provided that her sister is handicapped and currently lives in a home in Ellisville, Mississippi. B.W. also has a half-brother.

[7] B.W. identified defendant in open court as her step-grandfather.

[8] B.W. explained that she primarily stayed with defendant and her grandmother because her father worked or would go out to bars.

years old.  In the first incident of sexual abuse involving defendant, which occurred around 1995 or 1996, defendant came into her bedroom, told her it was time to change for bed, and assisted her with changing her clothes.  Defendant told her he was removing her underwear because it was wet, and he "accidentally touched [her] and said 'oops.'"  He touched her on her vagina; her underwear was on at the time.  Afterwards, the State inquired: "Now at some point of course your underwear's been removed was there any touching skin to skin by the defendant to your vagina?"  B.W. responded: "Yes."  She recalled defendant smiled after he touched her.  Another incident involving defendant took place during the day in the living room when she was around five or six years old.  Defendant took off her underwear and touched her on her vagina with his fingers.  He asked B.W. how she felt.  Other times, defendant used other instrumentalities, such as a toothbrush and a Barbie doll leg, to touch her "in [her] vagina."[9]

Additionally, beginning when she was five or six years old, there were incidents during which defendant made B.W. touch him when they were in the living room.  While his bottoms were off, defendant began making her touch his penis with her hand.  Defendant explained to her how to "touch and rub" his penis and that she could "make it grow."  At the same time, defendant touched her on her vagina with his hand; she described this as "rubbing and finger insertion."  He also instructed B.W. to open her mouth and he put his penis in her mouth.  Defendant made her lick his penis and made her watch him ejaculate.  Defendant made her have oral sex with him on multiple occasions, confirming that these incidents occurred when she was between the ages of five and eight years old.  B.W. verified that defendant performed oral sex on her on multiple occasions, and it began when he told her that he wanted to try something on her.

B.W. also testified that defendant showed her pornography.  She remembered the first time this happened.  When she was in the

---

[9] On cross-examination, B.W. specified that these events, involving the toothbrush and Barbie doll, began to progress when she was approximately six or seven years old.

living room, defendant expressed his desire to show her a movie, and he played pornography. B.W. described it as a man and a woman having sex.[10] Defendant told her they were going to try to do those things and they would subsequently re-enact what was done on the television in the living room. After defendant removed their clothing, they went upstairs to her bedroom where he placed her on her back on the bed. Defendant knelt down and began rubbing and touching her vagina. He then rubbed her vagina with his penis before beginning to insert it. When B.W. told him it hurt, defendant told her he was sorry and she was "too small."[11] She denied this incident was the only time he inserted his penis into her vagina; she explained these acts happened on more than one occasion. B.W. stated these acts of penetration began when she was around six or seven years old. These incidents ceased when she reached puberty, around the age of eleven or twelve in 2001 or 2002. At that point, defendant then informed B.W. they could not do anything anymore because "something could happen."

B.W. further elaborated that defendant tried to insert his penis into her vagina multiple times. She could not recall how many times, but she confirmed it was a "regularly repeating occurrence." B.W. confirmed these incidents began when she was between five and seven years old and continued until she was eleven. Defendant instructed her to remain silent about the abuse because it would "make them jealous or upset with [her]." As a child, B.W. did not initially believe the sexual abuse was wrong because defendant was family and she trusted him. While taking a "sex ed" class, around the time she was ten or eleven years old, she realized defendant had been sexually abusive to her. B.W. remembered informing her aunt, Florence Daugherty,[12] about the sexual abuse when she was around eleven or

---

[10] In addition, B.W. remembered defendant would put on a recording of him and B.W. She described the recorded act between them involving "touching, oral."

[11] B.W. indicated on cross-examination she was six or seven years old when defendant tried to insert his penis inside of her. When questioned about his ability to do this, she answered, "He began to."

[12] Throughout the transcript, Florence is referred to by other names, including Florence Eva Daugherty and Eva Daugherty. She will be referred to as Ms. Daugherty herein.

23-KA-400                                    5

twelve years old, while Ms. Daugherty was residing at the duplex. She recalled being informed that her aunt went to the Simoneaux or Riley residence, confronted them, and asked what had happened.

B.W. recounted the events leading to her living with Ms. Daugherty in Kentucky. She stated she had a journal in which she documented the sexual abuse (but did not name the perpetrator), which she first gave to a friend to read, and then gave to her stepmother, who read it and called the police. When the police attempted to speak with her, B.W. denied the sexual abuse described in the journal, as the police incorrectly assumed it was her father, Mr. Raley. B.W. said no one in her family believed what had happened to her, and they called her a "whore," "hoe," and "b*tch," as well as a liar. Defendant did not speak up and her grandmother did not believe her, called her names, and slapped her. She was approximately fifteen or sixteen years old when she told her father about what defendant had done to her. Her father kicked her out of the residence afterwards. She then went to Mississippi to live with her Aunt Vicki[13] before going to live at Ms. Daugherty's residence in Kentucky. At the age of seventeen, she acquired her own residence and had no contact with defendant during that period.

In her testimony, B.W. also recounted details of three suicide attempts she made, as a result of severe depression, the first when she was eleven years old, the second at fifteen or sixteen, and the final time at age twenty-five, for which she has received treatment and is in therapy.

B.W. stated she reconnected with defendant after her Aunt Vicki passed away around 2012 or 2013. They maintained contact after she moved back to Louisiana with her husband, spending holidays with the family in Mississippi where defendant lived at the time. Following her grandmother's passing, she assisted defendant in disposing of belongings before he moved out of state. B.W. and defendant lost contact until he resumed texting her, having obtained her address earlier. After Hurricane Ida hit in 2021, defendant texted

---

[13] The record does not reflect Vicki's last name.

her and checked in on her due to her husband's deployment. Approximately one month before defendant arrived at her house, he started texting her about the past and his sexual activities with her stepmother, which she found strange. She indicated she no longer had those text messages.

B.W. testified defendant arrived uninvited at her residence in September 2021 and stayed for approximately an hour. During their conversation, he made admissions to her. After he departed, B.W. contacted both her deployed husband and her father.[14] B.W. confirmed the conversation was recorded in both audio and video formats by the surveillance system at her home. She explained that she downloaded the video using the screen record feature on her phone due to it only downloading five-minute clips. She gave the video to the police the following day.

Ms. Daugherty, B.W.'s aunt, testified her brother was B.W.'s father, who had recently passed away. According to Ms. Daugherty, she met defendant through a coworker, and Ms. Daugherty married defendant's son. They were only married for a few months before he committed suicide. In the aftermath of the suicide, she and defendant supported each other and shared an apartment to save money for a duplex they bought together located at 2834 and 2836 Kingston Street in Kenner, with the arrangement that he would reside in one half while she occupied the other half. She described defendant as her best friend, mentioning that he looked after her son, and they did everything together. After defendant met and fell in love with her mother, Ms. Daugherty's relationship with defendant changed. Eventually, her mother moved in with defendant. She denied observing any interaction between defendant and B.W. as B.W. was asked to go to another room whenever Ms. Daugherty visited.

Ms. Daugherty recalled on two occasions, B.W. disclosed sexual abuse, which involved defendant's penis, her vagina, her

---

[14] B.W. testified that initially, she thought her father would believe her. It only occurred to her that the conversation between defendant and herself was captured on her surveillance camera when she was speaking to her father on the phone, exclaiming: "[O]h, my God it's on my camera."

breasts, her mouth, and his fingers. She confirmed she was the sole member of her family who believed B.W. Regarding the initial occasion, when B.W. was approximately eleven or twelve years old, Ms. Daugherty recalled B.W. disclosing to her that "Papaw Sidney" was sexually abusing her. B.W. told her that she did not like what he did to her. After the disclosure, Ms. Daugherty discussed it with her mom, brother, and defendant. They told her that B.W. was lying, making things up for attention, and suggested B.W. may have recreated incidents based on hearing about Ms. Daugherty's sister being abused.

Around the time B.W. was fifteen or sixteen years old, Ms. Daugherty recalled B.W. again disclosing the abuse to her. Ms. Daugherty remembered B.W. coming to live with her because nobody wanted B.W. around because they believed she was lying. B.W. ended up living with her for two to three years. When asked if, at any point, she learned B.W. accused her father of sexually assaulting her, Ms. Daugherty answered she could not say whether B.W. did or did not.

Ms. Daugherty explained her brother believed B.W.'s allegations against defendant after defendant visited B.W.'s house and reminisced in front of the video camera. She recalled speaking to her brother on the phone after "the revelation of the recording." She described him as distraught, feeling guilty, and blaming himself for putting B.W. in the situation. She personally felt disgusted, betrayed, and responsible for bringing defendant into her family's life.

Detective Peter Foltz with the Kenner Police Department was assigned to conduct a follow-up investigation in this case. The investigation started when B.W. went to the police station to file a report and provided the video recording from her residence surveillance system showing her and defendant. He confirmed viewing the video and identified defendant as the person depicted in it. During the investigation, he learned the abuse occurred at a duplex located at 2834 and 2836 Kingston Street in Kenner. After reviewing the video, he conducted an interview with B.W., during which she disclosed sexual abuse.

The detective then spoke with Ms. Daugherty, B.W.'s father, and B.W.'s friend to whom B.W. had given the journal. As a result of the investigation, an arrest warrant was approved for defendant.[15] Defendant was ultimately arrested by the McComb Police Department and extradited back to Louisiana.[16]

Detective Foltz obtained a medical waiver from B.W. for her medical records. During the detective's conversation with B.W., she detailed the progression of the sexual acts inflicted upon her by defendant. She advised him the abuse occurred from the time she was five or six years old until she was twelve years old and moved to LaPlace. Detective Foltz identified State's Exhibit 1 as the disc that contained the video recording the victim provided to Officer Schilling on September 11, 2021. State's Exhibit 1 was admitted into evidence and published to the jury. Therein, defendant reminisces about "the whole everything that went on," offering detailed memories of specific acts of sexual abuse defendant performed upon B.W. or made her perform upon him.

The following summary of the video recording is based on this Court's review.[17]

> In the video, B.W. and defendant can be seen conversing at her residence. Defendant mentions he should have left the house sooner. He expressed many of the things that "had gone on before are really deep in [his] head." He explained to B.W. he quit writing to her because she was "in his head a whole bunch." He described how he used to never remember his dreams, but he started remembering them. He recalled in his dreams, he would have sex with Mrs. Raley and then, instead of her, it would be B.W. Defendant expanded on how it "was screwed up," and he ceased writing with her because it was "really getting inside of [his] head." He mentioned he "sat there, remembering everything the whole everything that went on." He told B.W., "Yeah, I

---

[15] The detective indicated defendant was charged with three counts of first degree rape and three counts of sexual battery under the age of thirteen. He explained he used the current statutes and then learned the crime was called aggravated rape from 1995 until 2003.

[16] Upon defendant's arrival in Louisiana, Detective Foltz notified defendant of his rights and defendant elected not to speak with him. He identified defendant in open court.

[17] *See* State's Exhibit 1.

molested you when you were young, and where did that come from, uhhh, it came from Vicki."

He informed B.W. he was taking care of her at the time, and as she got ready for bed, he remembered going upstairs to find her on the pillow with a big smile on her face. He recalled getting ready for bed and taking B.W.'s underwear off. He recounted B.W. was wet, and when he touched her, she went "hmmm." He remembered saying, "Wow, she really is," after which he tasted it. He told B.W., "Let me tell ya, I'm going to tell you something, you had the sweetest p***y I had ever tasted in my life." Defendant stated, "I'm telling the truth, and I ended up messing around with you because it was, and you were the sweetest young thing I had ever tasted in my life."

Defendant recalled a day when Mrs. Simoneaux informed him she was tired and mentioned needing to take Nicole[18] to the doctor the following day. He told B.W.: "And it's terrible but when she was doing that, leaving you home with me, and that's when I was messing with you. …" Defendant repeated that he was "fooling around" with B.W. while Mrs. Simoneaux was at the hospital. He explained that due to Mrs. Raley's presence coinciding with Mrs. Simoneaux's departure from the house, he could not "mess around" with B.W. Defendant further recalled that following B.W.'s family's relocation to LaPlace and his own move to Mississippi, he was sitting at his house when a beautiful young lady walked past him.[19] He told B.W. she "was no longer a little girl, [she] was a beautiful young lady, a sexy young lady."

Defendant laughed, apologized, and stated he did not mean to harm her, and B.W. expressed she was glad at his admission. He provided that when she informed them about him molesting her, the only mistake she made was mixing up the times it occurred. Defendant explained to B.W.: "You were a little girl so the times were not as important to you then as they were later on." He told B.W. that he never called her a liar or accused her of lying during that incident. B.W. replied they assumed it, to which defendant explained it was due to the incorrect time frame. He clarified the timing was off by six months, and it could not have occurred because he was in the hospital at that time. B.W. told defendant her grandmother was aware, and she informed her before her passing. Defendant mentioned discussing it with her

---

[18] Based on the context of the record, it appears Nicole is B.W.'s biological sister.

[19] From the context of his statement, it appears defendant was suggesting that the "beautiful young lady" was B.W.

before her death. He conveyed his need to tell this to B.W., which prompted him to stop writing. He expressed B.W. was "deep inside of his head" at the time, and he wanted to discuss everything in person, rather than over the phone. He expressed that sometimes B.W. will catch him looking at her "really funny because that's still inside [his] head," but he tells himself he cannot "think on them." Defendant told B.W., "But it's still there, and every once in a while, I'll look at you and think 'That was the sweetest I ever had.'"

## ASSIGNMENT OF ERROR NUMBER ONE

### *Denial of Motion in Limine*

In his only assignment of error, defendant contends the trial judge erred by admitting the recording made by B.W. using her phone to film surveillance-camera footage displayed on her television. He asserts B.W. recorded the footage by pointing her phone at the television while it played, without downloading or storing it in cloud storage. He contends the recording could not be retrieved after a single playback. He maintains this recording did not satisfy the requirements of La. C.E. art. 1002. Further, he argues the video did not capture the entire conversation and asserts the defense could not verify its authenticity as they could not inspect the original footage. Defendant avers the evidence should not have been admitted under La. C.E. art. 1003 because the State did not establish it was an accurate duplication of the original recorded video.

The State argues defendant's claim regarding the video's authenticity lacks merit. The State asserts the video clearly captures defendant's admission to sexually abusing B.W. The State argues any additional conversation between the two, whether it occurred before or after the video recording, does not render the conversation captured by the video inadmissible. The State posits it established the origin of the video recording and explained why the original recording was not available. Additionally, B.W. testified about the circumstances surrounding the video recording and the challenges in obtaining the original. The State maintains the trial court sensibly applied the "best evidence" rule and concluded that the duplicate video recording was admissible. It concludes there is no merit to defendant's contention the trial court abused its discretion in denying the Motion *in Limine*.

At trial, Detective Foltz identified State's Exhibit 1 as the video recording provided by the victim to the police in September 2021, confirming its origin from B.W.'s home surveillance system. Despite the defense's objection based on its Motion *in Limine*, the trial court permitted the introduction of the video recording. B.W. testified that following her conversation with defendant, she discovered it was recorded on her home surveillance system equipped with audio and video. She stated her father instructed her to download the video. She explained she used "screen record" on her phone due to the video only being able to download in five-minute clips. B.W. surrendered the video to the police the following day. After acknowledging the earlier objection from defense counsel, the trial court allowed the video to be admitted and played at trial.

La. C.E. art. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La. C.E. art. 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation." A district court's ruling on the admissibility of evidence will not be reversed absent an abuse of discretion. *State v. Ard*, 20-221 (La. App. 5 Cir. 4/28/21), 347 So.3d 1046, 1055.

Pursuant to La. C.E. art. 1002, "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided by this Code [of Evidence] or other legislation." La. C.E. art. 1003 provides an exception to the general rule, to wit:

> A duplicate is admissible to the same extent as an original unless:
>
> (1) A genuine question is raised as to the authenticity of the original;
>
> (2) In the circumstances it would be unfair to admit the duplicate in lieu of the original; or

(3) The original is a testament offered for probate, a contract on which the claim or defense is based, or is otherwise closely related to a controlling issue.

Electronic duplicates are addressed in La. C.E. art. 1003.1: "A duplicate may not be deemed inadmissible or excluded from evidence solely because it is in electronic form or is a reproduction of electronically imaged or stored records, documents, data, or other information."

Definitions pertinent to this matter are set forth in La. C.E. art. 1001, to wit:

(3) Original. An "original" of a writing or recording is the writing or recording itself or any counterpart intended to have the same effect by a person executing or issuing it. An "original" of a photograph includes the negative or any print therefrom. If data are stored in or copied onto a computer or similar device, including any portable or hand-held computer or electronic storage device, any printout or other output readable by sight, shown to reflect the data accurately, is an "original."

\* \* \*

(5) Duplicate. A "duplicate" is a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or electronic imaging, or by chemical reproduction, or by an optical disk imaging system, or by other equivalent techniques, which accurately reproduces the original.

"Where the document offered in evidence is a mechanical reproduction of the original, and is its substantial equivalent, it is admissible unless it can be shown by the defendant that its content does not accurately reflect the original." *State v. Vincent*, 338 So.2d 1376, 1381 (La. 1976). *See also State v. Lewis*, 567 So.2d 726, 728 (La. App. 2 Cir. 1990), *writ denied*, 575 So.2d 364 (La. 1991).

Also, La. C.E. art. 901 relates to the authentication of evidence. La. C.E. art. 901(A) provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Such evidence may come in the form of

testimony by a witness with knowledge that the matter is what it is asserted to be; indications of the item's distinctive characteristics, including its contents, substance, internal patterns, and other distinctive characteristics; or evidence describing the process or system used to produce the item and showing that the process or system produces an accurate result. *State v. Vice*, 22-512 (La. App. 3 Cir. 4/19/23), 365 So.3d 155, 163, *writ denied*, 23-669 (La. 11/21/23), 373 So.3d 457 (citing *State v. Rice*, 14-466 (La. 6/29/17), 222 So.3d 32, 33 (*per curiam*)). *See also* La. C.E. art. 901(B)(1), (4), and (9).

No Louisiana cases directly address the exact issue before the Court. However, the following cases provide us guidance.

In *Vincent*, *supra*, a motion was filed to suppress the defendant's typewritten, inculpatory statement given by the defendant after his arrest by the New Mexico police, approximately seven days after the murder. The statement was objected to because the State was permitted to introduce uncertified copies, which the defendant contended are not best evidence, citing La. R.S. 15:436.[20] Apparently following federal practice, the Las Cruces police retained the originals of written statements for one year only. After that time, and prior to destroying the originals, the police made microfilm copies of all statements, retaining only the microfilm. The trial judge permitted the introduction of a copy of the document made from the microfilm on the ground that a police officer testified that the copy introduced was exactly like the original statement made to him by the defendant. *Vincent*, 338 So.2d at 1381. The Louisiana Supreme Court found the ruling was correct, explaining that "[w]here the document offered in evidence is a mechanical reproduction of the original, and is its substantial equivalent, it is admissible unless it can be shown by the defendant that its content does not accurately reflect the original." *Id.*

In *State v. Spradley*, 97-2801 (La. App. 1 Cir. 11/6/98), 722 So.2d 63, *writ denied*, 99-125 (La. 6/25/99), 745 So.2d 625, the

---

[20] The First Circuit explained in *State v. Francis*, 597 So.2d 55, 59 (La. App. 1 Cir. 1992) that the repeal of La. R.S. 15:436 and the adoption of the Code of Evidence resulted in the "demise" of the broad "best evidence" rule of exclusion of evidence.

defendant contended the trial court erred in allowing the State to introduce a copy of the videotapes of the crime. He argued the explanations regarding the State's failure to introduce the original were insufficient and unsatisfactory and no testimony was given to explain the absence of the original videotapes. The defendant claimed he was denied a fair trial because copies of the tapes were used. *Id.* at 70. The detective testified that when making videotapes of undercover drug buys, the same tape was used the entire night and a number of transactions were recorded on one tape. Thereafter, each individual transaction was put on a separate tape. The detective stated he brought the tapes of the defendant's transactions to court and verified the tapes were accurate depictions of the original recordings. An officer confirmed the detective's testimony. The appellate court found the defendant made no showing or claim that the original videos of the crimes were not accurately depicted in the versions introduced at trial and found the defendant's argument was without merit. *Id.* at 71.

In *State v. Joe*, 28,198 (La. App. 2 Cir. 7/26/96), 678 So.2d 586, *writ denied*, 97-559 (La. 10/31/97), 703 So.2d 16, the defendant argued the trial court committed manifest error in overruling his objection to playing a copy of a videotape depicting the crime scene. Specifically, he argued the original 8 mm tape of the crime scene made by the investigating deputy should have been played instead. The State contended the original 8 mm tape could not be played as it was not compatible with the courtroom equipment available and the VHS video was an exact duplicate of the original. *Id.* at 591. There, the court pointed out the defendant did not raise the issue of the authenticity of the original 8 mm tape, but merely stated the original is required from the plain reading of La. C.E. art. 1002. The court emphasized that the defendant failed to acknowledge the exception found in Article 1003. *Id.* at 592. The court provided that neither the State nor the court was equipped to play the original tape in the 8 mm format to the jury. The deputy testified he made the original tape of the crime scene and the original video was used to make the subsequent VHS video. The deputy further testified he reviewed the

VHS copy and it was an exact duplication of the 8 mm original.  The State offered both the 8 mm and the VHS videos as evidence.  *Id.*  The court found the defendant made no showing or claim that the original video of the crime scene was not accurately depicted in the VHS version.  The court further found that absent further showing, the defendant's argument that the original must be produced in accordance with La. C.E. art. 1002 fails.  The court explained that La. C.E. art. 1003 "allows a duplicate admissible to the same extent as an original when there is no question as to the authenticity of the original and it would not be unfair to admit the duplicate in lieu of the original."  Therefore, the court held the assignment lacked merit.  *Id.*

In *State v. Wise*, 2010 WL 1838403 (La. App. 1 Cir. 5/7/10), *writ denied*, 10-1324 (La. 1/7/11), 52 So.3d 884, the defendant contended the trial court erred in overruling the defense objection to the authenticity of the videotape offered into evidence.  Id. at *7.  As background, the State filed a motion to introduce evidence, requesting the trial court to order an attached "continuous" VHS cassette of the entire December 21, 2006 statement be placed into evidence as a substitute for State's number six.  The State contended that the proposed substitute was the cassette that was introduced at the motion to suppress hearing and played in its entirety.  The audio recording of the December 21 statement was entered into evidence as State's number seven.  The motion further contended that after introducing exhibit six into evidence, the State erroneously placed into evidence the VHS cassette that only contained the first part of the December 21 statement, instead of the VHS cassette of the entire statement played during the hearing.  The trial court granted the State's motion to substitute the VHS cassette.  The First Circuit recounted the lieutenant testified that the videotape in question contained the entire interview that was originally recorded on two separate videotapes and the copy accurately depicted the original recordings.  The appellate court held the defendant failed to make a showing that the content of the purported copy did not accurately reflect that of the originals.  Thus, the court found no error in the admission of the videotape.  *Id.*

In the instant case, during the Motion *in Limine* hearing, the State presented an affidavit from B.W. stating she could not download the full recording from her Vivint Mobile Home Security app on her phone. Instead, she chose to screen record the conversation between defendant and herself using her phone screen record feature. She explained she resorted to this method because she could not access the video on her computer. Additionally, she stated she did not alter or add to the recording in any way. During the trial, B.W. provided testimony indicating her surveillance system possesses both audio and video capabilities. She briefly clarified she utilized screen recording to download the video due to the recordings being available in only five-minute segments.

Upon review, we find no abuse of discretion in the trial court's ruling that the recording is an admissible duplicate under La. C.E. art. 1003. As previously mentioned, where the "document" offered in evidence is a mechanical reproduction of the original and is its substantial equivalent, it is admissible unless the defendant can show that its content does not accurately reflect the original. *Vincent*, 338 So.2d at 1381. The re-recording in question, State's Exhibit 1, was created by B.W. when she played the original surveillance video within the app on her phone and simultaneously recorded it using the screen recording function on her phone. As pointed out by the trial court at the hearing on the Motion *in Limine*, the time stamp on the video consistently ran without any apparent time jumps. Despite the defense's contention that the video could easily be spliced or edited, defendant did not point to any specific indication of alteration or tampering of the video. Further, B.W. attested that the copy depicts the recording and she did not alter or add to the video in any way. Accordingly, we conclude B.W.'s attestation established the recording was accurate and defendant failed to make a showing that the content of the purported copy of the video does not accurately reflect that of the original. This assignment of error is without merit.

# ERROR PATENT REVIEW

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990).

## Sex Offender Registration

The record reflects that the trial court failed to inform defendant of the sex offender registration requirements in accordance with La. R.S. 15:540, *et seq.* Defendant's convictions of aggravated rape in violation of La. R.S. 14:42, aggravated oral sexual battery in violation of La. R.S. 14:43.4, and sexual battery in violation of La. R.S. 14:43.1 are defined as sex offenses under La. R.S. 15:541(24). La. R.S. 15:543(A) requires that the trial court notify a defendant charged with a sex offense in writing of the registration requirements of La. R.S. 15:542.

The trial court's failure to provide the notification constitutes a patent error and warrants a remand for written notification, even where a life sentence has been imposed. *See State v. Doucet*, 17-200 (La. App. 5 Cir. 12/27/17), 237 So.3d 598, 609-10, *writs denied*, 18-77 (La. 10/8/18), 253 So.3d 789, and 18-196 (La. 11/5/18), 255 So.3d 1052, *cert. denied*, -- U.S. --, 139 S.Ct. 2676, 204 L.Ed.2d 1079 (2019). Accordingly, we remand this case to the trial court with instructions to the trial judge to inform defendant of the registration requirements for sex offenders by sending appropriate written notice to defendant and to file written proof in the record that defendant received such notice.

## Imposition of Sentences without Benefits as to Counts Three and Four

The sentencing hearing transcript reflects that the sentences on counts three and four were imposed without a restriction of benefits. Likewise, the sentencing minute entry and the State of Louisiana

Uniform Commitment Order ("UCO") reflect that the sentences on counts three and four were imposed without a restriction of benefits.[21]

Under La. R.S. 15:301.1 and *State v. Williams*, 00-1725 (La. 11/28/01), 800 So.2d 790, a statute's requirement that a defendant be sentenced without the benefit of parole, probation, or suspension of sentence is self-activating. Therefore, as to counts three and four, the trial court's failure to impose defendant's sentence without the benefit of parole, probation, or suspension of sentence requires no corrective sentencing action. However, the UCO and the sentencing minute entry are also devoid of defendant's restriction of benefits. In *State v. Jones*, 22-527 (La. App. 5 Cir. 5/24/23), 366 So.3d 821, 837, this Court remanded the matter for correction of the minute entry and the UCO to show that the defendant's sentences were to be served without the benefit of parole, probation, or suspension of sentence. As such, we remand this matter for such correction of the UCO and the sentencing minute entry.

## DECREE

For the foregoing reasons, defendant's convictions and sentences are affirmed. The matter is remanded to the trial court with instructions to the trial judge to inform defendant of the registration requirements for sex offenders by sending appropriate written notice to defendant and to file written proof in the record that defendant received such notice, and also for correction of the UCO and the sentencing minute entry as set forth above.

## AFFIRMED; REMANDED WITH INSTRUCTIONS

---

[21] More specifically, under the section labeled, "Amount of time to be served without benefit, if applicable," the UCO states, "LIFE as to counts 1 and 2."

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **JULY 10, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 23-KA-400

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE DANYELLE M. TAYLOR (DISTRICT JUDGE)
MONIQUE D. NOLAN (APPELLEE)      THOMAS J. BUTLER (APPELLEE)          BERTHA M. HILLMAN (APPELLANT)

**MAILED**
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
JOAN BENGE (APPELLEE)
LASHANDA WEBB (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053